FILED
United States Court of Appeals
Tenth Circuit

September 17, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

JEREMY VAUGHN PINSON,

Defendant–Appellant.

Nos. 07-6013; 07-6079; 07-6081

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NOS. CR-06-114-1-R; CR-07-023-1-R)**

---

Julia C. Summers, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant–Appellant, in No. 07-6013 & 07-6079.

Joseph L. Wells, Oklahoma City, Oklahoma, for Defendant–Appellant, in No. 07-6081.

James F. Robinson, Assistant U.S. Attorney (John C. Richter, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE**, **McKAY** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

Mr. Jeremy Vaughn Pinson, a mentally-ill inmate with a propensity for making grandiose threats, was convicted of one count of threatening to harm the President of the United States in violation of 18 U.S.C. § 871. Following his conviction, but prior to sentencing, he falsely told the district court that another inmate intended to kill his sentencing judge. Shortly after this, in a letter to the Chief Judge for the Western District of Oklahoma, he threatened to injure a juror who had served on his trial. He was charged with, and pleaded guilty to, one count of knowingly and willfully making a materially false, fictitious, and fraudulent statement to a United States Marshal in violation of 18 U.S.C. § 1001(a)(2), and one count of mailing threatening communications in violation of 18 U.S.C. § 876(c). At sentencing, the district court expressed concern over the danger Mr. Pinson posed to the public. The court varied upward and imposed the statutory maximum on each of the three counts, to be served consecutively, for a sentence of 240 months imprisonment. He now appeals his conviction for threatening the President of the United States, as well as his above-Guidelines sentence given for the three different convictions. We affirm both his conviction and sentence, though not without some qualms about the latter.

## I. Facts

On August 17, 2005, while incarcerated at the Lawton Correctional Facility in Lawton Oklahoma, Mr. Pinson sent President George W. Bush a letter through the United States Mail stating "YOU WILL DIE SOON! DIE BUSH DIE."

Indictment at 1. On May 17, 2006, following an investigation by the United States Secret Service, Mr. Pinson was indicted for "knowingly and willfully threaten[ing] the President of the United States by depositing in the United States Mail a letter threatening to kill and inflict bodily harm upon the President." Indictment, at 1; *see also* 18 U.S.C. § 871(a). A Federal Public Defender was appointed to the case; Mr. Pinson filed a motion for hybrid representation, which the court denied.

Because Mr. Pinson had previously exhibited signs of severe psychiatric and other mental health problems, his competency to stand trial was in doubt. He was evaluated in Fort Worth, Texas; during this time, he attempted suicide several times and was placed on suicide watch. The Forensic Staff determined that "Mr. Pinson had not experienced any significant period of effective psychological functioning since early childhood," Dist. Dkt. Doc. 27, at 9, but nonetheless determined that he was competent to stand trial, *id*. at 1. On September 28, 2006, the district court held a fifteen-minute hearing and found Mr. Pinson competent; the court set the case for the November trial calendar and subsequently granted his motion for self-representation.

The jury trial lasted from November 13 to 14. Mr. Pinson did not deny sending the letter, but testified that the letter was not a threat but rather a warning about a code he had cracked predicting that the President would be killed by some third party. The jury apparently did not agree, and it found Mr. Pinson guilty.

Mr. Pinson's confinement between his conviction and sentencing did not go smoothly. He had many mental breakdowns and committed several disciplinary infractions. He also falsely informed a Deputy United States Marshal that an inmate at the jail intended to kill his sentencing judge and mailed another district judge a letter threatening to injure a juror from his trial. On February 6, 2007, he was charged in a two-count indictment with making materially false statements in violation of 18 U.S.C. § 1001(a)(2) and making a threat to injure through the United States' mail in violation of 18 U.S.C. § 876(c). He pleaded guilty to both counts on March 16, 2007.

Prior to a consolidated sentencing on all the convictions, the court gave the parties notice of its intention to consider an upward variance based on 18 U.S.C. § 3553(a)(2)(C)—the need to protect the public from Mr. Pinson's further crimes. Mr. Pinson's sentencing was held on April 2, 2007. For Mr. Pinson's violation of 18 U.S.C. § 871(a) (*Pinson I*), the Presentence Investigation Report (PSR) calculated a base offense level of 12; after a two level enhancement for threatening the juror pursuant to U.S.S.G. § 3C1.1, the total offense level was 14. Mr. Pinson's prior criminal history placed him in Category VI, giving him a guideline range of 37–46 months. For Mr. Pinson's other violations, (*Pinson II*), the PSR found a total offense level of 23 and a criminal history level of IV, giving him a guidelines range of 70–87 months. At sentencing, based on his sentence in *Pinson I*, the district court added two additional criminal history

-4-

points pursuant to U.S.S.G. § 4A1.1(b). This placed Mr. Pinson within a guidelines range of 84–105 months.

Several witnesses testified at the sentencing hearing. First, United States Secret Service Agent Lori Bynum, the investigating officer, testified for the government in support of the upward variance. She testified about a letter Mr. Pinson had sent to his Aunt Renee, where he described violent acts he had committed against animals and people. She also described additional threats Mr. Pinson made in letters, including a threat to "drive an ammonium nitrate-filled garbage truck into 210 Park Avenue," and a threat to "terroriz[e] the nation with roadside bombs, then place them in schools, elementary schools." R. Vol. V at 30, 33. Agent Bynum agreed with the prosecutor that a "theme of violence" appeared throughout Mr. Pinson's letters. *Id.* On cross-examination, Agent Bynum admitted that she could not corroborate that Mr. Pinson had actually carried out any of these threats, nor could she confirm whether Mr. Pinson had committed the crimes about which he had bragged. She also admitted that she had not reviewed Mr. Pinson's mental health history and treatment beyond her discussion with Mr. Pinson. *Id.* at 37, 39–40.

After the government presented its evidence, psychologist Dr. Melvin Gerald Preisz testified for the defense. Prior to sentencing, Dr. Preisz examined Mr. Pinson and reviewed psychological reports from various mental facilities where Mr. Pinson had previously received treatment and evaluations. He also

reviewed Mr. Pinson's letters. Dr. Preisz concluded that Mr. Pinson suffered from severe and chronic posttraumatic stress disorder (PTSD) stemming from

> long years of abuse history, not having any real home, not having any furniture, moving endlessly from one place to another . . . having a grandfather that was so abusive and so tortuously cruel and schizophrenic himself and an alcoholic himself, that he—that he left Mr. Pinson, at times, locked out of his own house in the middle of the winter to freeze, almost to death . . . and to [sic] beat him in ways that were unmerciful.

*Id.* at 57–58. He also found that Mr. Pinson exhibited some signs of malingering, anti-social personality disorder with severe borderline characteristics, and an inability to relax, which Dr. Preisz believed led to the letter-writing and threat-making. *Id.* at 48–51. He confirmed that Mr. Pinson had suicidal tendencies and ideation, *id.* at 52, and expressed his surprise that Mr. Pinson hadn't done any worse harm, because "he's been so damaged in some many different ways," *id.* at 53. Dr. Preisz continued:

> Although I certainly don't condone any of what he's done and certainly [am] not trying to rationalize the way—the very scary letters that he's written in the past and a very scary history that could have been so much more worse, because the damage that was done to him is beyond most people's comprehension. And they would never realize that the kind of deprivation he had in childhood was so severe that even I find it hard to believe and I've had 40 years of experience and I've seen cases that are extremely severe and extremely dangerous, and very violent.

*Id.* at 53–54. He also stated that Mr. Pinson's condition was treatable, but that

> being in a jail without activities for [Mr. Pinson] is a cruelty, because he actually relaxes when he has work. He's one of those paradoxical types that he needs to be worked a lot, because standing in jail, he

> paces and goes over and over all of the people that he feels have been unfair to him and abusive, including his early maternal grandfather, who beat him in ways and treated him in ways that even you don't see in movies . . . .

*Id*. at 55. "[W]ith the reservation that they find the right kind of treatment program, . . . and with the provision that he can find it in himself to take the medication that he does need and that a competent psychiatrist with lots of experience can provide . . . I do see him as being able to learn to deal with his intense emotions, his need for revenge, and his need to address people who are abusive to himself and others." *Id*. at 55–56. Dr. Preisz recommended at least four to eight years of intensive, structured therapy. *Id*. at 59. On cross-examination he stated that without medication, treatment, and incarceration, Mr. Pinson had the "potential to be dangerous," and that the danger was "moderately high." *Id*. at 73.

Finally, several witnesses addressed the court on Mr. Pinson's behalf. His mother described the long history of schizophrenia in her family and some of the delusions that he experienced. She explained that "when he was hospitalized and on medication . . . he has thrived and done so much better. Unfortunately, my job transferred me and I had to take him away from the situations where it really were [sic] more positive for him." *Id*. at 77–78. She also informed the court of several of his prior diagnoses, including bipolar disorder, schizophrenia, ADD, and ADHD. *Id*. at 80.

Defense counsel encouraged the district court to "consider from the record that Mr. Pinson has [had] a very troubled history from the time he was a young child," *id*. at 82, and counsel also reminded the court that Mr. Pinson's last confirmed violent act occurred when he was 13—over seven years before. *Id*. at 83. Mr. Pinson also addressed the court and expressed his remorse at the poor judgment he had exhibited. *Id*. at 86.

After considering all of the testimony and evidence, the district court stated that it found the case very difficult: "I'm very sympathetic to you for your unfortunate background and apparently it was a very unfortunate background. And I recognize your intelligence . . . . You're very intelligent, you're very capable, you're very articulate, and it's a shame to see that wasted like this." *Id*. at 87. The court found that while "some of those letters [Mr. Pinson] sent could be merely hyperbole, I would think that, but for your history of violence. I think the public needs to be protected from you, unfortunately." *Id*. at 88. The district court sentenced him to the statutory maximum in *Pinson I*, a term of imprisonment of 60 months. For largely the same reasons, the court sentenced Mr. Pinson to the statutory maximum on both counts in *Pinson II*, to be run consecutively, resulting in a term of imprisonment of 180 months. The district court again varied upward and ran the sentences in *Pinson I* and *II* consecutively, for a total sentence of 240 months' imprisonment.

Mr. Pinson appeals the district court's sentence. Additionally, he brings two trial-related complaints: first, that the court violated his right to compulsory process when, the day of trial, it reversed its prior ruling and allowed the introduction of evidence about Mr. Pinson's intent without granting a continuance; and second, but relatedly, that the jury instructions impermissibly focused on his intent. We deny all three claims and affirm the district court's decision.

## II. Trial Claims

Prior to trial, both the government and Mr. Pinson sought to introduce evidence about his intent when he wrote the letter to President Bush. According to Mr. Pinson, his proffered evidence would demonstrate that he intended the letter as a warning against a third party's planned attack; the government's evidence would show that not only did Mr. Pinson intend that the letter be understood as a threat, but that he intended to actually carry out that threat. At a November 1 pre-trial motions hearing, the district court held that the test for whether a statement qualified as a "true threat," a requirement for conviction under 18 U.S.C. § 871, was an objective one, based solely on a reasonable recipient's perception upon reading the letter. Because both the government's and Mr. Pinson's proffered evidence was irrelevant to this reasonable recipient test, the district court excluded it. *See* R. Vol. III. at 48–49.

On November 9, 2006, the government filed a "Motion to Reconsider Testimony," citing the Tenth Circuit's uniform jury instructions. These instructions require the jury to find that "the defendant understood and meant the words . . . as a threat," and that "the defendant . . . wrote . . . the words knowingly and willfully." Tenth Circuit Criminal Pattern Jury Instruction 2.36 (2006 ed.). After examining these instructions, the district court reversed its prior ruling the morning of trial and admitted the government's evidence. *See* R. Vol. IV at 3–4.

### A. *The District Court's Failure to Grant a Continuance*

Mr. Pinson first argues that the court's reversal of its own ruling immediately before trial, combined with its failure to grant a continuance, made it impossible to subpoena witnesses who would testify favorably about his lack of intent. He therefore claims that his right to compulsory process was violated.

The first question we must face is whether this error, if it was error, was preserved. Immediately after changing its ruling, the trial judge asked Mr. Pinson if he wished to call the witness he had previously identified as relevant to his intent: "Now, Mr. Pinson, you had requested an inmate witness that you thought was relevant on this issue. Is that somebody that's necessary?" *Id*. at 3. In response, Mr. Pinson informed the court that "I think at this point it's too late. And this person's testimony just would not be substantial enough to allow the jury to decide whether a person thought the letter was a threat or not." *Id*. at 4.

-10-

Appellate counsel, at oral argument, asked that we treat Mr. Pinson's response to the court—"at this point it's too late"—as a request for a continuance. While we construe a *pro se* defendant's submissions liberally, *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1187 (10th Cir. 2003), this proffered reading is beyond plausibility. Had Mr. Pinson said nothing else in addition to "it's too late," counsel's argument might have some merit, as this statement could be interpreted as an attempt to inform the court that, given the close proximity to trial, subpoenaing the witness was impossible without a continuance. Mr. Pinson, however, did not *only* reply that it was "too late." He also stated that "this person's testimony just would not be substantial enough to allow the jury to decide whether a person thought the letter was a threat or not." R. Vol. IV at 4. This was an affirmative reassurance to the court that there was no testimony available that could assist him on the intent element. In no way can these statements, taken in totality, be construed as a request for the court to continue the trial.

The question then becomes whether it was plain error for the district court not to grant a continuance *sua sponte*, and despite Mr. Pinson's assurance that the witness could not be substantial enough to help the jury. We think not. To be plain error, a district court's decision must have plainly been in error based on the evidence before it. *See United States v. Redcorn*, No. 06-5206, 2008 WL 2332005, *13 (10th Cir. June 9, 2008). Even assuming Mr. Pinson would have

been entitled to a continuance if he had asserted that a potential witness was important and that he needed time to obtain his presence, it was not error for the court to proceed with the trial when it had no reason to think a potential witness could affect the outcome.

Nor has Mr. Pinson shown that the testimony he would have presented was "material and favorable" to his case. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). While his brief lists several witnesses that he wished to call, Aplt.'s Br. 15, he has not provided us with any information regarding what their testimony would have entailed or how their testimony would have improved his case. Counsel at oral argument also shed no light on this matter. "Though we do not require detailed descriptions of what has been lost," Mr. Pinson must still make a "'plausible showing' that the lost testimony was material and favorable." *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir. 2002) (quoting *Valenzuela-Bernal*, 458 U.S. at 873). Mr. Pinson has fallen short of this burden, and we therefore deny his claim that his Sixth Amendment rights were violated.

### B. The Jury Instructions

Mr. Pinson next argues that the district court erred in instructing the jury that it must find that "the defendant understood and meant the words [mailed] [written] [said or uttered] as a threat." Tenth Circuit Pattern Criminal Jury Instruction 2.36. According to Mr. Pinson, this instruction required the jury to consider his state of mind when he wrote the letter, which is not relevant under

-12-

the Tenth Circuit's interpretation of 18 U.S.C. § 871.  Appellant argues that this erroneous instruction was problematic, as it allowed the government to introduce extremely prejudicial testimony against him.  Mr. Pinson lodged a timely objection to the instruction in district court.  R. Vol. IV at 141–42.  We review the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law.  *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000).  We then review any instructions offered by the defendant and rejected by the court.  A defendant is entitled to an instruction on his theory of the case if the instruction is a correct statement of the law, and if he has offered sufficient evidence for the jury to find in his favor.  We review a district judge's refusal to issue a requested instruction under this standard for abuse of discretion.  *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006).

> Section 871 states that
>
> whoever *knowingly and willfully* deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, . . . or *knowingly and willfully* otherwise makes any such threat against the President, . . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 871 (emphasis added).

Our Court, like most others, employs an objective standard to evaluate whether a defendant "willfully" made a threat, holding that the "willfulness"

-13-

requirement is satisfied when "those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law." *United States v. Dysart*, 705 F.2d 1247, 1256 (10th Cir. 1983); *see also United States v. Hart*, 457 F.2d 1087, 1090 (10th Cir. 1972); *Rothering v. United States*, 384 F.2d 385 (10th Cir. 1967).

Mr. Pinson argues that the jury instructions violated the objective standard and instead mirrored the minority, subjective intent standard, which requires the government to demonstrate that the threat was *actually* "made with a present intention to do injury to the President." *United States v. Patillo,* 438 F.2d 13, 15–16 (4th Cir. 1971). The jury instructions read:

> To find the defendant guilty of this crime you must be convinced that the Government has proved each of the following beyond a reasonable doubt:
>
> *First*: The Defendant mailed or wrote the words alleged to be the threat against the President of the United States as charged in the Indictment;
>
> *Second*: The Defendant understood and meant the words mailed as a threat; and
>
> *Third*: The Defendant mailed or wrote the words knowingly and willfully.

Dist. Dkt. Doc. 65, at 16. The second element, according to Mr. Pinson, delves into his subjective intent in a manner that is impermissible under *Dysart*.

We do not agree. The burden is on the prosecution to show that the defendant understood and meant his words as a threat, and not as a joke, warning,

-14-

or hyperbolic political argument. But a threat violates the law even if the defendant had no actual intention, or even ability, to carry it out. If the school bully tells his victim to give him his lunch money or he will give him a black eye, these words are a threat even if the bully is bluffing. By contrast, if one actor tells another, "break a leg," that is not likely to be meant as a threat. The proper question for the jury is whether the defendant meant his words as a threat and whether a reasonable person would so regard them. The instruction here conveyed at least the first element of that meaning.[1] It does not imply that the defendant must be shown to have intended to carry out the threat, but it does require that the defendant understood and meant his words to be a threat.

Even if the instruction were erroneous, however, Mr. Pinson's claim still must fail. Even if the instructions did delve into his subjective intent to carry out the threat, this was an added burden placed on the government. It required the

---

[1] Appellant does not complain that the instruction fails to direct the jury to consider whether a reasonable person would regard the words as a threat. The pattern instructions used by the Ninth Circuit emphasize the probable perception of the person who receives the threat rather than the meaning or understanding of the defendant:

> First, the defendant intentionally threatened, either in writing or orally, to [kill] [injure] [kidnap] the President of the United States; and
> Second, under the circumstances in which the threat was made, a reasonable person would foresee that it would be understood by persons hearing or reading it as a serious expression of an intention to [kill] [injure] [kidnap] the President of the United States.

Ninth Circuit Model Jury Instructions 8.39. We are inclined to think that both pattern instructions, that of the Ninth and that of the Tenth, contain valuable elements not contained in the other.

-15-

government to prove an additional element, namely, Mr. Pinson's actual intention when he made the threats. An incorrect instruction that is beneficial to the defendant is generally not considered prejudicial. *See Killian v. United States*, 368 U.S. 231, 258 (1961).

In some rare circumstances, a jury instruction that erroneously places an additional burden on the prosecution may be challenged by the defendant on appeal on the ground that "the jury instructions impermissibly confused the jury as to the issue before it." *See United States v. Romero*, 136 F.3d 1268, 1273 (10th Cir. 1998), *citing Michaud v. United States*, 350 F.2d 131, 133–34 (10th Cir. 1965). In this case, there no evidence of jury confusion. There was sufficient evidence to support every element of the crime charged, even if the instructions directed the jury to consider Mr. Pinson's subjective intent. Mr. Pinson admitted to writing, and understanding the meaning of, the words "YOU WILL DIE SOON! DIE BUSH DIE!" Indictment, at 1. The jury could easily have found willfulness under an objective standard—a reasonable recipient certainly might interpret this statement as a threat on his life. *See Dysart*, 705 F.2d at 1256 (reasonable recipient standard). Additionally, there was sufficient evidence to satisfy the (erroneous) subjective standard, as Agent Bynum testified to Mr. Pinson's statements that he intended to carry out the threats he made. R. Vol. IV at 59–60. However the jury instructions might have been understood, there was evidence to support a conviction. *Cf. Michaud* 350 F.2d at 133–34

-16-

(overturning a conviction where the jury was instructed that the maker of threats "intended to carry them out," but there was no evidence in the record to support such a finding).

### III. Sentencing Claims

Mr. Pinson also claims that his above-Guidelines sentence was unreasonable. In *Pinson I*, his Guidelines range was 27–33 months; the district court sentenced him to the statutory maximum of 60 months. In *Pinson II*, his Guidelines range for both counts was 84–105 months. The district court sentenced him to the statutory maximum for each count: 60 months for Count 1 and 120 months for Count 2. Moreover, contrary to the Guidelines' recommendation that the sentences run concurrently, *see* U.S.S.G. § 5G1.2, the district court determined that all three sentences must run consecutively, for a total of 240 months. This 240-month sentence is thus a 135-month increase from the high end of the recommended Guidelines range.

Under 18 U.S.C. § 3553(c), the court must state, "in open court the reasons for its imposition of the particular sentence, and, if the sentence—is . . . outside the [guidelines ] range, . . . the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in the written order of judgment and commitment." *See United States v. Angel-Guzman*, 506 F.3d 1007, 1016–17 (10th Cir. 2007). The court must also address, in its statement of reasons, the material, non-frivolous arguments made by the

defendant. *Id.; United States v. Hall*, 473 F.3d 1295, 1314 (10th Cir. 2007); *United States v. Sanchez-Juarez*, 446 F.3d 1109, 1115–16 (10th Cir. 2006). The district court is not required to recite "any magic words" to demonstrate that it has considered all of the relevant arguments, but we will not "presume the district court weighed a party's arguments in light of the § 3553(a) factors where the record provides no indication that it did so." *Sanchez-Juarez*, 446 F.3d at 1116.

Mr. Pinson argues that the district court failed to provide specific reasons for its imposition of a sentence so substantially higher than the Guidelines recommended. In particular, he argues that the district judge relied too heavily on conduct he engaged in while a juvenile in concluding that his threats of violence were more than hyperbole and that the judge failed to explain why he rejected the recommendation of the mental health expert that he be given four to eight years of "intensive, structured therapy" rather than 20 years of mere imprisonment. In his briefs, Mr. Pinson characterizes these arguments as going to the issue of substantive unreasonableness. In *Gall v. United States*, 128 S. Ct. 586, 597 (2007), the Supreme Court clarified what constitutes procedural error and what falls under substantive unreasonableness review. Procedural review includes "failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id. Gall* was decided after Mr. Pinson filed his brief; we therefore give him the benefit of the

-18-

doubt and construe these claims as procedural unreasonableness arguments. We also consider Mr. Pinson's argument that his sentence was substantively unreasonable.

### A. Adequacy of the Court's Explanation

Insofar as Appellant claims that the district court's explanation for his above-Guidelines sentence was generally insufficient under 18 U.S.C. § 3553(c), we cannot agree. The district court thoroughly explained that the upward variance was needed to protect the public from Mr. Pinson, and it more than adequately articulated the factors that drove it to this conclusion:

> at the age of 13 . . . you chased your mother in her bathroom and struck the door with an axe; at age 13, you sent your mother a threatening letter; at age 13, you sent a letter to the President threatening the President at that time; at age 13, you were convicted of assault and battery against an employee of a juvenile facility; at age 16, you were convicted of break [sic] and entering. This involved breaking into a congressional candidate's office and writing such words as "whore, slut" and "nigger lover" on the walls and stole [sic] equipment. You have attempted suicide on at least four occasions. In 1996, you were hospitalized for psychiatric care and you had to be secluded from making threats to the staff. While currently incarcerated, you have had at least 22 misconduct write-ups, including grabbing feces out of a toilet and smearing it and blood on yourself and on the walls. We know about the letters that were testified to by the witness. From the psychiatric report, the following information: "Mr. Pinson reported that his mother was afraid of him because he tried to stab her and put ipecac"—whatever that is—"in her food." In an e-mail of August 30, 2005, Mr. Pinson's mother wrote, "I would not be surprised if someday he either kills me or does significant harm to me." You've reported having significant problems in the sixth grade when you attempted to—or threatened to blow up the school. You were suspended from school for being disruptive at the age of 10. At age 13, you stabbed

-19-

a schoolmate 15 times with a pen. Mr. Pinson reported he always liked to play with fire and began making bombs around age 15. He stated he enjoyed killing and torturing animals, like dogs, cats, birds and insects, because he thought it was funny. And he also added, "I always felt I would upgrade to people one of these days."

In an e-mail, Debra Pinson wrote, "Mr. Pinson has a history of doing things to people and animals. He beat one of my dogs to death once because he got mad at me. He kicked another in the head and killed it." Mental health records from 1996 indicate that Mr. Pinson has hurt others with objects, such as knives, and also has hurt the family dog.

I think with this kind of a background, I'm afraid for other people, and I think it's my duty to protect the public against further crimes of this defendant and potential crimes in the future.

R. Vol. V at 88–90. There is no ambiguity in the district court's reasoning for varying upward. The plethora of bizarre events dating back to Mr. Pinson's early youth convinced the court that Mr. Pinson presented a risk to the public. A more thorough explanation than this one is not required.

Appellant's more specific complaints about the court's statement of reasons carry more weight, but ultimately do not require reversal of the sentence. First, he argues that the district court's conclusion that he poses a danger to the public was based on impermissible considerations and was inadequately explained. It should be noted that the crimes for which Mr. Pinson was convicted were based on making threats and false statements, not on acts of violence. The district court explained the need for incarceration far beyond the Guidelines recommendation on the ground that while "some of those letters [Mr. Pinson] sent could be merely

hyperbole, I would think that, but for your history of violence. I think the public needs to be protected from you, unfortunately." R. Vol. V at 88. As Appellant points out, however, no evidence was presented in court of any acts of violence against people after the age of 13. (Mr. Pinson is now 21 years old.)

We regard the district court's conclusion that Mr. Pinson's threats were more than "hyperbole" and actually present a danger to the public as factual in nature, and entitled to deference on appellate review unless clearly erroneous. And while it may be true that the documented cases of violence in Mr. Pinson's past date to his early teen years, there is evidence in the record that he continues to present an actual danger. Mr. Pinson's own expert, Dr. Priesz, testified that Mr. Pinson had a "moderately high . . . potential to be dangerous," R. Vol. V at 73, though he believed Mr. Pinson had "a chance" to overcome his personality disorders given appropriate treatment and therapy, *id*. at 57. Indeed, Dr. Priesz commented that he was "surprise[d] . . . [Mr. Pinson had not] done so much harm to himself that either it's resulted in his death or in harming others." *Id*. at 62. Even Mr. Pinson's mother, who testified in his favor at the sentencing hearing, acknowledged in an e-mail that she "would not be surprised if someday he either kills me or does significant harm to me." *Id*. at 89. Moreover, the evidence in the record seems to show that Mr. Pinson brutally killed a family dog, and told his aunt that he would "upgrade" to people. *Id*. In light of this evidence, we

-21-

cannot agree that the district court's explanation for the sentence was without evidentiary support.

To the extent that Mr. Pinson complains that the district court improperly relied on his juvenile conduct, the argument has no merit. Mr. Pinson does not object to the district court's sentencing guidelines calculation, which took into account his juvenile conviction for breaking and entering. His objection, therefore, must be to the district court's use of his juvenile activities to justify the upward variance. While the weight the district court places on certain factors is reviewed for substantive unreasonableness, use of an improper factor is reviewed for procedural unreasonableness. *See, e.g., Smart*, 518 F.3d at 803–04 (it is procedural sentencing error to give significant weight to an irrelevant or improper factor). There are likely some boundaries on what factors sentencing courts can permissibly consider at sentencing—for example, it would surely be impermissible for a court to consider the defendant's race in support of an upward variance—but aside from these few exceptions, we have repeatedly stated that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005) (citing 18 U.S.C. § 3661); *see also Williams v. New York*, 337 U.S. 241, 246 (1949).

Under the circumstances of this case, Mr. Pinson's behavior as a juvenile is not irrelevant to evaluating his threat to the public under § 3553(a)(2)(C). Because Mr. Pinson was only 21 at the time of sentencing, to disregard his behavior as a teenager could lead to an inaccurate assessment of his dangerousness, as there would be insufficient out-of-custody behavior for the court to evaluate. *See United States v. Davis*, 48 F.3d 277, 280 (7th Cir. 1995) ("These pubescent transgressions, when considered along with adult offenses, help the sentencing judge to determine whether the defendant has simply taken one wrong turn from the straight and narrow or is a criminal recidivist."). The district court committed no procedural unreasonableness in examining Mr. Pinson's juvenile conduct.

Appellant also complains that the district court did not provide a specific reason for its decision not to adopt Dr. Preisz's recommendation that he be given four to eight years of extended therapy. The record reveals, however, that the district court considered Dr. Priesz's testimony and took it into account. The district judge stated that he considered "Dr. Preisz's excellent statement," R. Vol. V at 87, and that the court was "very sympathetic to [Mr. Pinson] for [his] unfortunate background." *Id.* The judge explained why he believed that protection of the public required a far more extended sentence of incarceration. This was sufficient explanation.

### B. Substantive Unreasonableness

Mr. Pinson was sentenced to 240 months' imprisonment—135 months above what he would have received had he been sentenced within the applicable guidelines range. In light of the § 3553(a) factors and recognizing the discretion vested in the district court over sentencing, we find this sentence reasonable, though not without some qualms.

In *Gall* and in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), the Supreme Court clarified what "abuse of discretion" entails, holding that sentencing review may not be based on "a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, 128 S. Ct. at 595; *see also United States v. Smart*, 518 F.3d 800, 807 (10th Cir. 2008).

At the same time, however—until the Supreme Court tells us otherwise—appellate review continues to have an important role to play and must not be regarded as a rubber stamp. *See Rita*, 127 S. Ct. at 2466–67 ("In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur."). The degree of variance from the recommended Guidelines range thus continues to be significant. As the Supreme Court explained in *Gall*, 128 S. Ct. at 597, it is "uncontroversial that a major departure should be supported by a more significant justification than a

-24-

minor one." A reviewing court therefore must determine if the district court's proffered rationale, on aggregate, justifies the magnitude of the sentence.

The upward variance here was unusually large, even by post-*Gall* standards. Nonetheless, we cannot regard the sentence as outside the range of reasonableness. The sentence was the product of the district court's belief that Mr. Pinson posed a danger to the public. 18 U.S.C. § 3553(a)(2)(C). Despite our own suspicion that Mr. Pinson's grandiose threats and often incredible claims of past violent acts are symptoms of his diagnosed mental illness and might better be treated as such, we have already explained why the district court's determination that Mr. Pinson presents an actual danger to the public is not clearly erroneous. We cannot disagree with the district court's decision that Mr. Pinson's inability to control his anger, as well as his prior breaking and entering and very serious threats, suggest that he might actually harm someone if given the chance. This conclusion seems eminently reasonable given Dr. Preisz's own testimony that he was "surprise[d] . . . [Mr. Pinson had not] done so much harm to himself that either it's resulted in his death or in harming others," R. Vol. V at 62, as well as his mother's similar assertion in an e-mail. *See United States v. Hines*, 26 F.3d 1469, 1473 (9th Cir. 1994) (departure warranted not to treat defendant but because he "posed an '*extraordinary danger* to the community because of his serious emotional and psychiatric disorders.'"); *United States v. Gillmore*, 497 F.3d 853, 857 (8th Cir. 2007) ("[defendant's] history of sexual abuse, chemical

-25-

dependency, and mental illness . . . made [her] a danger to herself and the public, warranting a significantly longer sentence than the Guidelines range."); *United States v. Cousins*, No. 05-04-CR-169, 2007 WL 1454275 (N.D. Ohio May 17, 2007) (imposing statutory maximum because "[t]he defendant's history of violent conduct, coupled with his obvious unstable mental condition . . . strongly suggest that [he] should never again be pardon [sic], paroled, or released into society."). In sum, we cannot find that the district court abused its discretion.

Mr. Pinson relies on *United States v. Allen,* 488 F.3d 1244 (10th Cir. 2007)*,* to support his substantive unreasonableness argument. To the extent that he is arguing that we must find "compelling reasons" to support so large a variance, see Aplt's Br. 23, this approach is no longer permissible after *Gall v. United States*, 128 S. Ct. 586, 595 (2007), and *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008). *Allen*, moreover, is distinguishable from the present case. Mr. Allen was convicted of a single count of possession of methamphetamine with the intent to distribute. Based on allegations that Mr. Allen had committed attempted sexual abuse of a child or solicitation of murder, the district court varied upward from a guidelines range of 120-135 months' to 360 months' imprisonment. *Id*. at 1260. We held this sentence substantively unreasonable because the district court effectively sentenced Mr. Allen based on "an entirely different, and far more serious, crime." *Id*. "[W]hatever latitude a sentencing court may have to adjust a defendant's sentence in an exercise of *Booker* discretion, it may not discard the

-26-

advisory Guideline range and impose sentence, instead, on the basis of evidence of the defendant's *uncharged, unrelated misconduct*, whether actually committed or contemplated for the future." *Id*. at 1262 (emphasis added). Mr. Pinson's case is different. Much of the conduct on which the district court based its variance was not unrelated to the conduct of his conviction: when a defendant is convicted of making threats of violence it is not unrelated to consider whether his threats pose an actual danger to the public. Because Mr. Pinson was not sentenced as if he had committed a totally different and "far more serious, crime," *id*. at 1260, we find no support in *Allen*.

Nonetheless, we take a moment to express our concern that courts use upward variances to increase the incarceration time for those who might pose a risk to the public *because of* their mental health problems. When a prisoner, soon to be released, may pose a substantial risk to himself or to others, the federal civil commitment statute provides a mechanism by which the facility director can further detain the inmate until this risk is ameliorated. 18 U.S.C. § 4246 (providing for further commitment of a "person in the custody of the Bureau of Prisons whose sentence is about to expire" who "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another"); *see also United States v. Moses*, 106 F.3d 1273, 1280 (6th Cir. 1997) (§ 4246 is "directly designed to forestall such danger [to the community] through continued

commitment after completion of the sentence. Otherwise, virtually every criminal defendant who, at the time of sentencing, met the dangerousness criteria of § 4246 would also be subject to an upward departure."). In order to impose such long-term commitment, the government must demonstrate at a hearing, by clear and convincing evidence, that the defendant poses a risk to the public because of a mental abnormality or personality disorder that is beyond his control. 18 U.S.C. § 4246(d); *see also Kansas v. Crane*, 534 U.S. 407 (2002) (government must prove that the defendant cannot control his dangerous behavior before court can impose civil commitment). When a district court enhances a sentence because the defendant's mental illness prevents him from controlling his actions, thereby increasing the risk he poses to the public, the district court in effect circumvents the civil commitment procedure and the procedural and substantive protections that go along with it: specifically, the clear and convincing evidence standard is replaced by the lower, preponderance of the evidence standard. This is particularly troubling given that the use of § 4246 provides for evaluation of the defendant's risk *after* he has received treatment during incarceration; the prediction of the risk the defendant will pose to the public upon release, made *before* treatment, is far more imprecise. *See* Note, *Booker, The Federal Sentencing Guidelines, And Violent Mentally Ill Offenders*, 121 Harv. L. Rev. 1133, 1144 (2008) ("To impose post-prison civil commitment, the state is required to prove an offender's continuing dangerousness by clear and convincing

evidence, whereas an above-Guidelines prison sentence relies on a possibly unreliable prediction of what the offender's mental health will be at the end of the Guidelines sentence.").

The Supreme Court has reaffirmed that district courts have wide discretion in choosing the factors it considers during sentencing. *See Gall*, 128 S. Ct. at 601–02. This is even true when, as here, the factor is a discouraged one under the guidelines. *See* U.S.S.G. § 5H1.3 ("[m]ental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted."); *Gall*, 128 S.Ct. at 601–02 (age). We stop short of prohibiting courts from considering whether a defendant's mental illness justifies an upward variance because it causes him to pose a risk to the public. But we encourage sentencing courts to consider that civil commitment procedures will be available if the defendant continues to pose a considerable risk to the public after confinement, mitigating the need for a prophylactic upward variance.

We **AFFIRM** Mr. Pinson's conviction and the sentence imposed by the United States District Court for the Western District of Oklahoma.