**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 24, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSE EDUARDO TRUJILLO,

    Defendant - Appellant.

No. 19-1351
(D.C. No. 1:18-CR-00555-PAB-2)
(D. Colorado)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

Jose Eduardo Trujillo pleaded guilty to one count of unlawful manufacture of

unregistered firearms and one count of possession of a machinegun.[1] The district

court sentenced Mr. Trujillo to 87 months' imprisonment. Mr. Trujillo appeals his

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] We use the one-word spelling of machinegun to be consistent with 18 U.S.C. § 922(o), the statute under which Mr. Trujillo was charged.

sentence as substantively unreasonable. Exercising our jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I.     BACKGROUND

In June 2018, special agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began investigating Mr. Trujillo's co-defendant, Andres Luna, who they suspected of trafficking drugs and firearms. A confidential informant introduced undercover ATF agents to Mr. Luna as potential customers. Mr. Luna began selling firearms to the agents, and he told the agents that his source was willing to lower the prices if the agents purchased larger quantities of firearms, ten to fifteen at a time.

On July 11, 2018, Mr. Luna sold the agents three firearms. The firearms were custom built and had no serial numbers or manufacturer markings. Mr. Luna showed the agents photographs of other custom-built firearms, and the agents arranged a meeting with Mr. Luna and Mr. Trujillo to place a large order of customized firearms.

The agents met with Mr. Luna and Mr. Trujillo on July 25, 2018. Mr. Trujillo's stepson was present for this transaction. Mr. Trujillo sold the agents an AR-15 type rifle, an AR-15 type pistol, and two silencers. Mr. Trujillo connected one of the silencers to the AR-15 type pistol, explaining to the agents that it would "fully" function with "subsonic ammunition." ROA, Vol. I at 28–29. He reassured the agents that he had tested the silencer in his basement and "they couldn't hear [it] upstairs." ROA, Vol. I at 29. Mr. Trujillo then connected the other silencer to the

AR-15 type pistol and dry-fired the pistol to demonstrate how "smooth" it functioned. ROA, Vol. I at 29. He described the AR-15 type rifle as a "ghost gun," and told the agents that the "best part" of the firearms was their lack of serial numbers. ROA, Vol. II at 29. Mr. Trujillo explained to the agents that the firearms were legal if the agents claimed to have built the firearms themselves. He further explained that the silencers were illegal to own, and if the agents wanted to make them legal, they would have to "pay the $200 tax stamp." ROA, Vol. I at 29. He told the agents that he kept the silencers separated from the firearms in case he was "pulled over" because they were illegal to own. ROA, Vol. I at 29.

Agents continued purchasing firearms from Mr. Luna and Mr. Trujillo. During their interactions, the agents told Mr. Luna they were willing to purchase the firearms in bulk so the firearms could be transported to Mexico. Mr. Trujillo understood the agents planned to transport the firearms to Mexico.

At a meeting with Mr. Luna and Mr. Trujillo on October 30, 2018, the agents purchased four firearms, three of which did not have serial numbers or manufacturer markings. The fourth firearm was a Glock that had been converted to a machinegun. Mr. Trujillo told the agents they could sell all the firearms with the option of being "full-auto" by installing devices he referred to as "Lightning Links." ROA, Vol. I at 29. Mr. Trujillo demonstrated how to convert a semi-automatic rifle to fully automatic by inserting a Lightning Link into the lower receiver of one of the rifles and function testing the rifle by charging it and pressing the trigger. This enabled the agents to hear the firing pin fall forward on an empty chamber. Mr. Trujillo told the

3

agents that most of the Lightning Links were matched to a specific gun and that he would "fine tune" them. ROA, Vol. I at 29–30.

Mr. Trujillo made and sold to the agents nine silencers and four Lightning Links. Of the firearms and silencers purchased, some of the firearms, but none of the silencers, had serial numbers. None of the silencers or machineguns were registered to Mr. Trujillo through the National Firearms Registration and Transfer Record.

On November 28, 2018, an ATF agent interviewed Mr. Trujillo. Mr. Trujillo initially denied making the firearms and claimed he only assembled them. He also denied knowing that the Glock was a machinegun. But Mr. Trujillo later admitted he made everything and was selling firearms to make "ends meet." ROA, Vol. II at 48. Mr. Trujillo also confessed to assembling ten firearms for and giving a couple of firearms to Mr. Luna, who Mr. Trujillo knew was a convicted felon.

A grand jury returned a twenty-one-count indictment that charged Mr. Trujillo in six of the counts with various firearm offenses. On June 21, 2019, Mr. Trujillo pleaded guilty to Counts Five and Fourteen of the indictment. Count Five charged Mr. Trujillo with unlawful manufacture of unregistered firearms in violation of 26 U.S.C. § 5861(f). Count Fourteen charged Mr. Trujillo with possession of a machinegun in violation of 18 U.S.C. 922(o).

In the Presentence Investigation Report ("PSR"), the United States Probation Office recommended a total offense level of 33. This total included a 6-level enhancement for the offense involving three or more firearms; a 4-level enhancement for the offense involving a firearm with an obliterated serial number; a 4-level

4

enhancement for trafficking firearms; a 4-level enhancement for transferring firearms with reason to believe they would be transported out of the United States; and a 3-level reduction for acceptance of responsibility. Mr. Trujillo had no prior criminal convictions, resulting in a criminal history category of I. The PSR calculated Mr. Trujillo's Guidelines range as 135 to 168 months' imprisonment.

Mr. Trujillo objected to both the 4-level enhancement for the offense involving a firearm with an obliterated serial number and the 4-level enhancement for transferring firearms with reason to believe they would be transported out of the United States. The district court sustained the former objection but overruled the latter. Accordingly, Mr. Trujillo's revised total offense level was 29, resulting in a Guidelines range of 87 to 108 months' imprisonment.

Prior to sentencing, Mr. Trujillo filed a Sentencing Memorandum in Support of Variant Sentence, requesting a sentence of probation. At the sentencing hearing, Mr. Trujillo's counsel argued for a sentence of probation or, alternatively, a below-Guidelines sentence of imprisonment. The United States argued for a within-Guidelines sentence of 96 months' imprisonment. The district court then considered these arguments and the 18 U.S.C. § 3553(a) factors before imposing a sentence of 87 months' imprisonment.

Mr. Trujillo now appeals, claiming his sentence is substantively unreasonable. We affirm.

## II. STANDARD OF REVIEW

"[T]he weight the district court places on certain [sentencing] factors is reviewed for substantive unreasonableness." *United States v. Pinson*, 542 F.3d 822, 835–36 (10th Cir. 2008). We review the substantive reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). We "will reverse only if the sentence imposed was arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. DeRusse*, 859 F.3d 1232, 1236 (10th Cir. 2017) (internal quotation marks omitted). That is, "we will reverse a determination only if the court exceeded the bounds of permissible choice, given the facts and the applicable law in the case at hand." *Id.* (quotation marks omitted).

"[W]e presume a sentence is reasonable if it is within the properly calculated guideline range." *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013). "The defendant may rebut this presumption by showing that his sentence is unreasonable in light of the sentencing factors delineated in 18 U.S.C. § 3553(a)." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1215 (10th Cir. 2008). "We do not reweigh the sentencing factors but instead ask whether the sentence fell within the range of rationally available choices that facts and the law at issue can fairly support." *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019) (internal quotation marks omitted). Thus, our analysis "examine[s] whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Chavez*, 723 F.3d at 1233 (internal quotation marks omitted).

6

### III.    ANALYSIS

We presume that Mr. Trujillo's 87-month, within-Guidelines sentence is reasonable. *See id.* Mr. Trujillo may rebut this presumption by demonstrating that the length of his sentence is unreasonable under the § 3553(a) factors. *See Alapizco-Valenzuela*, 546 F.3d at 1215. Mr. Trujillo's appeal challenges the district court's consideration of the need for the sentence imposed to generally deter similar criminal conduct and the weight the district court gave to that particular § 3553(a) factor. *See* 18 U.S.C. § 3553(a)(2)(B) (requiring the court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct") As Mr. Trujillo explains, "The district court identified what was needed for general deterrence: a sentence that would not be seen as really light or very light." Aplt. Reply Br. at 5. And Mr. Trujillo contends that a below-Guidelines sentence could have accomplished that need, and thus the bottom-of-the-Guidelines sentence that the district court imposed was substantively unreasonable.

Mr. Trujillo claims the district court's sentencing explanation implies that its refusal to impose a below-Guidelines sentence was based on general deterrence alone: "The nature of the offense conduct . . . was subordinate to the interest in general deterrence. It was the interest in general deterrence, and not what the district court had earlier said about the offense conduct, that the district court cited as a reason for not giving 'some substantially reduced sentence.'" Aplt. Br. at 17 (quoting ROA, Vol. III at 70); *see also* Aplt. Br. at 18–19 ("[T]he district court's remarks about the offense conduct cannot be read as a reason why it adhered to a guideline

7

sentence and declined to vary downward given the lack of any interest in protecting the public from future crimes by Mr. Trujillo."). But upon examination of the district court's complete rationale for imposing an 87-month sentence, it is clear the district court found that another factor—the need for just punishment—not only counseled against imposing a substantially reduced sentence, but also supported imposing a within-Guidelines sentence.

The district court began its sentencing explanation by noting the Guidelines range and its discretion to impose a sentence outside that range. The court then reviewed Mr. Trujillo's arguments for a below-Guidelines sentence:

> One is because given the fact that he doesn't really have any criminal history, there is not even a traffic ticket cited anywhere in the Presentence Investigation Report, that Mr. Trujillo is unlikely to recidivate. There is really no need for any further deterrence; that Mr. Trujillo does not pose a threat to society; that deterrence generally is a somewhat shaky concept, particularly in this case because it is unlikely that additional time would deter Mr. Trujillo additionally; and that even with the concept of general deterrence, that that would not in this particular case justify some type of sentence of imprisonment.

ROA, Vol. III at 65.

The district court also noted that it had considered the § 3553(a) factors, and it specifically discussed several of those factors. With respect to the nature and circumstances of the offense, *see* § 3553(a)(1), the district court indicated the transactions underlying the counts of conviction involved selling weapons to law enforcement officers. And the court considered Mr. Trujillo's representations that he was not trying to earn a profit selling weapons but had simply gotten carried away with his hobby of making guns. As for Mr. Trujillo's history and characteristics, *see*

*id.*, the district court noted Mr. Trujillo's lack of criminal history and the supportive letters he submitted to the court from his family.

The district court then weighed these mitigating facts against less favorable ones. The court was troubled that Mr. Trujillo had involved his stepson in one of the transactions underlying the counts of conviction. The district court was also concerned that Mr. Trujillo tested weapons in the basement of his home: "[H]obbyists don't do that, shooting a few rounds down in the basement. . . . That's . . . dangerous[,] irresponsible behavior." ROA, Vol. III at 66. From the court's perspective, Mr. Trujillo's interest in firearms "way crossed the line" when he "t[oo]k the extra step and convert[ed receivers] to make something automatic." ROA, Vol. III at 67. And Mr. Trujillo was not only selling the items he was making, but he was also "taking an extra step in selling them for specific illegal purposes, particularly having knowledge these are going to go down to Mexico and essentially be used by cartels to fight wars against the Mexican federal police." ROA, Vol. III at 67. Although Mr. Trujillo's conduct at issue did not involve violence, "he was aware of what the intent of the would-be buyers w[as,] and that didn't stop him at all." ROA, Vol. III at 69.

The district court further reasoned that Mr. Trujillo's lack of a criminal history was outweighed by the fact that Mr. Trujillo knew his conduct was illegal:

> So the fact that he doesn't have any criminal history doesn't make any difference to me because, you know, the evidence that each one of these guns would take him about a day to make, it's deliberate behavior over a period of time. He is choosing to do it and he made a really serious mistake. You know, it's no excuse that Mr. Trujillo was just one of these

9

guys, like super good at gunsmithing, that he just got carried away. If you're a really good printer, does that give you an excuse to counterfeit money? No. If you're a really good painter, does that give you an excuse to create counterfeits which you sell? No. And anyone who took that step, which, of course, they would also know is highly illegal, would expect that if caught, they were going to get in trouble.

Mr. Trujillo knew that too, which is one of the reasons he was so deceitful once he got caught. And that distinguishes him from, say, Al Capone's bookkeeper or something like that, some low-level functionary who was involved with the bad guy but maybe didn't put two and two together. Mr. Trujillo actually had dealings with these customers and was telling the customers how to use them, how to avoid criminal liability if they were caught. You know, he was right up there up front in terms of the steps that were necessary to put them out on the street, namely the sale of them.

ROA, Vol. III at 68–69; *see also* ROA, Vol. III at 67 ("He [wa]s trafficking in silencers which he knows are highly illegal.").

The district court thought that "Mr. Trujillo ha[d] learned his lesson," and that "Mr. Trujillo is not the type of person who is likely to recidivate." ROA, Vol. III at 70. But the district court did not think that the consequent lack of a need for the sentence imposed to deter Mr. Trujillo from future criminal conduct and protect the public from future crimes of Mr. Trujillo "would justify some type of non-prison sentence," or even "justify some substantially reduced sentence." ROA, Vol. III at 70. Rather, the district court reasoned that the need for the sentence imposed to generally deter similar criminal conduct outweighed the lack of need for specific deterrence and protecting the public from further crimes of Mr. Trujillo:

If Mr. Trujillo who has no criminal history and has an aptitude for weapons manufactur[ing] gets a really light sentence, I don't think that sends a very good message to people because we know there is a lot of these 80 percent conversion cases out there floating around waiting for people who have the aptitude to drill a couple holes to convert guns into automatic use, that type

10

of thing. I don't think it's a good thing that someone could think that you're just going to get a very light sentence; maybe prohibit you from owning firearms again, but after all if you're converting something into an automatic weapon, you may not be too deterred, you know, by that prospect.

ROA, Vol. III at 70-71.

And importantly, the district court made it clear that its decision to impose a within-Guidelines term of imprisonment was based not only on the need for general deterrence, but also on "the need for the sentence imposed . . . to reflect the seriousness of the offense . . . and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The district court explained, "I think that some type of a punitive sanction, by that, prison in this particular case, is appropriate and necessary *both to punish Mr. Trujillo for a very serious misjudgment on his part*, but also for general deterrence purposes." ROA, Vol. III at 71 (emphasis added).

Thus, contrary to Mr. Trujillo's contentions, the district court's interest in general deterrence was not the primary reason it imposed a within-Guidelines sentence. The district court specifically stated that the sentence it imposed was based *both* on the need for just punishment *and* the need for general deterrence. *See* 18 U.S.C. § 3553(a)(2)(A)–(B). This clear statement of the district court's reasoning can only be read as providing *two* § 3553(a) factors as bases for imposing the 87-month sentence. The district court was permitted to weigh the § 3553(a) factors in this manner and conclude that an 87-month sentence was appropriate.

There is nothing in the district court's thorough sentencing explanation that demonstrates its weighing of the § 3553(a) factors and the sentence imposed were

11

"arbitrary, capricious, whimsical, or manifestly unreasonable" or "exceeded the bounds of permissible choice, given the facts and the applicable law in the case at hand." *DeRusse*, 859 F.3d at 1236 (quotation marks omitted). Accordingly, the district court did not abuse its discretion when it imposed an 87-month, bottom-of-the-Guidelines sentence, based on the need for just punishment and general deterrence.

## IV.    CONCLUSION

We **AFFIRM** the district court's judgment.

Entered for the Court


Carolyn B. McHugh
Circuit Judge