FILED
United States Court of Appeals
Tenth Circuit

**April 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

CAMILLE SUZANNE LENTE,

       Defendant-Appellant.

No. 07-2035
(D.C. No. CR-05-2770-JC)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **HOLMES**, Circuit Judge.

**PER CURIAM**.

Defendant-Appellant Camille Suzanne Lente pleaded guilty to three counts of involuntary manslaughter in violation of 18 U.S.C. §§ 13, 1153, and 1112, and one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153 and 113(a)(6). The district court sentenced Ms. Lente to 216 months'

---

[*]     This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

imprisonment, which was 159 months above the upper end of the Guidelines range of 46 to 57 months. On appeal, Ms. Lente contends that her sentence is substantively unreasonable; that the government breached its plea agreement; and that the district court erroneously enhanced her sentence based upon facts that were not proven beyond a reasonable doubt.

Judge Holmes would remand, holding that Ms. Lente's sentence is substantively unreasonable. Judge Hartz would remand, holding that the government breached the plea agreement.

Accordingly, we **REMAND** to the district court with instructions to **VACATE** Ms. Lente's sentence, and direct that Ms. Lente be resentenced by a different judge.

Judge McWilliams dissents from the judgment and would affirm the sentence.

07-2035 - *United States v. Lente*

**HARTZ**, Circuit Judge, concurring:

In my view the government breached its plea agreement with Ms. Lente. The government cannot stipulate in the plea agreement that a defendant is entitled to a guidelines reduction in offense level for acceptance of responsibility and then endorse a presentence-report recommendation that the court vary upward because of the defendant's failure to accept responsibility. *See United States v. Cachucha*, 484 F.3d 1266, 1270 (10th Cir. 2007). Although this breach by the government does not implicate the sentencing judge in any wrongdoing, we have recognized that the only relief that we can grant is resentencing by another judge. *See id.* at 1271 ("We intend no criticism of the district judge by this action, and none should be inferred." (internal quotation marks omitted)).

07-2035 - *United States v. Lente*

**HOLMES**, Circuit Judge, concurring:

While I concur in the disposition, I write separately to explain why I believe Ms. Lente's sentence is substantively unreasonable.[1]

## I. BACKGROUND

On the night of December 2, 2005, after consuming between 13 and 19 beers, Ms. Lente drove her mother's Chevrolet Suburban on the Isleta Indian Reservation, which is located in New Mexico. At approximately 10:40 p.m., her Suburban, which was northbound, crossed the center line of the highway into the southbound traffic lane, causing a head-on collision with a Ford Ranger truck, driven by Jessica Murillo. Ms. Lente's passenger in the Suburban, Anthony Tewahaftewa, and the two passengers in the Ford Ranger, Andres Murillo and Joshua Romero, were declared dead at the scene. Ms. Murillo survived, but sustained fractures to her right femur, right shoulder, and right ankle, and

---

[1] Ordinarily, when the government has breached a plea agreement, we will remand for resentencing by a different judge. *See United States v. Cachucha*, 484 F.3d 1266, 1271 (10th Cir. 2007). When a sentence is held to be substantively unreasonable, however, we normally will not require resentencing by a different judge. In this case, both Judge Hartz and I believe that Ms. Lente must be resentenced, but we base our conclusions on different reasons. In the interest of justice and with the pragmatic recognition that we must resolve this case, I believe that remanding for resentencing by a different judge is an appropriate exercise of judicial discretion. I emphatically note that I "intend no criticism of the district judge by this action, and none should be inferred." *Id.* (quoting *United States v. Mondragon*, 228 F.3d 978, 981 (9th Cir. 2000)).

received numerous facial lacerations. Ms. Lente suffered two broken ankles and a dislocated hip. Ms. Murillo and Ms. Lente were transported to a hospital.

Two hours after the accident, a blood sample was taken from Ms. Lente. Ms. Lente's blood alcohol level ("BAL") was 0.21—over two times the New Mexico legal limit of .08—and marijuana was present in her system.[2] In the following days, Ms. Lente was interviewed twice at the hospital. She admitted to drinking heavily before the accident, consuming between 13 and 19 beers.[3] However, Ms. Lente blamed her passenger, Mr. Tewahaftewa, for the collision, claiming that he pushed the steering wheel into oncoming traffic. An accident re-construction report discredited this account; the collision was not at a pronounced angle, which it would have been if the passenger suddenly had caused the vehicle to swerve.

Ms. Lente was charged with three counts of involuntary manslaughter in violation of 18 U.S.C. §§ 13, 1153, and 1112, and one count of assault resulting

---

[2] *See generally* N.M. Stat. § 66-8-102(C)(1) (2005) (noting that it is "unlawful" for a person "to drive a vehicle within this state" who "has an alcohol concentration of eight one hundredths or more in his blood"). Although the accident occurred on the Isleta Reservation (that is, within Indian Country as defined by federal statute), the government assimilated New Mexico's drunk driving statute pursuant to 18 U.S.C. § 13 for purposes of establishing elements of the predicate conduct for the federal involuntary manslaughter offense.

[3] In her opening brief, Ms. Lente admits to having consumed between 13 and 19 beers, Aplt. Opening Br. at 3, and the Presentence Report ("PSR") indicates that Ms. Lente's admissions to the investigators, although not precise, also were in that range, R., Vol. II, ¶¶ 10, 12 at 3-4 (Presentence Report, dated Sept. 12, 2006, revised Dec. 14, 2006) [hereinafter, "PSR"].

in serious bodily injury in violation of 18 U.S.C. §§ 1153 and 113(a)(6). The

prosecution was founded on federal Indian Country jurisdiction, because Ms.

Lente is an Indian and the crimes occurred on Indian Country (i.e., the Isleta

Reservation).[4] Ms. Lente entered into a plea agreement, pleading guilty to all

four counts in the indictment. In return, the government stipulated that Ms. Lente

had accepted responsibility and was therefore entitled to a three-level reduction in

her base offense level under the Sentencing Guidelines.

The Presentence Report ("PSR") computed an advisory Guidelines range of

46 to 57 months.[5] For each of the three involuntary manslaughter convictions, the

PSR assigned a base offense level of 22 under U.S.S.G. § 2A1.4. Twenty-two is

the highest base offense level under that provision and is reserved for those

instances in which "the offense involved the reckless operation of a means of

transportation." U.S.S.G. § 2A1.4(a)(2)(B). There were no further adjustments.

Thus, the adjusted offense level for each of these offenses was 22. As for the

assault resulting in serious bodily injury conviction, which related to Jessica

---

[4] *See* 18 U.S.C. § 1153. *See generally United States v. Tindall*, 519 F.3d 1057, 1060 n.1 (10th Cir. 2008); *United States v. Zunie*, 444 F.3d 1230, 1232-33 (10th Cir. 2006).

[5] The PSR's computations were based on the 2005 edition of the United States Sentencing Guidelines Manual ("U.S.S.G."). The parties do not contend that the PSR's reliance on that edition was improper. Therefore, I place reliance upon it here as well, unless I expressly indicate otherwise.

Murillo, the driver of the Ford Ranger, the PSR noted a base offense level of 14 under U.S.S.G. § 2A2.2.

The Guidelines specific offense characteristics take into account the seriousness of the injuries suffered by an assault victim; specifically, additional offense levels are assigned to reflect more serious injuries. Operating with reference to the injury classifications of the Guidelines, U.S.S.G. § 2A2.2(b)(3), the PSR characterized Ms. Murillo's injuries as "between serious bodily injury and permanent or life-threatening injury." R., Vol. II, ¶ 39 at 15 (Presentence Report, dated Sept. 12, 2006, revised Dec. 14, 2006) [hereinafter, "PSR"]. Accordingly, it adjusted Ms. Lente's offense level upward by six, yielding an adjusted offense level of 20. *See* U.S.S.G. § 2A2.2(b)(3)(E).

The Guidelines grouping rules, which must be referenced when a defendant is convicted of multiple counts, expressly have made the policy judgment to exclude offenses under Chapter Two of Part A of the Guidelines, which covers Ms. Lente's crimes, from a grouping process that relates to aggregate harm and to treat such offenses as separate groups. *See* U.S.S.G. § 3D1.2; *id.* § 3D1.2 cmt. background ("[A] defendant may stab three prison guards in a single escape attempt. Some would argue that all counts . . . should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected . . . ."). As a consequence, under this Guidelines chapter and part, even when a defendant's convictions relating to multiple victims arise from a single

-4-

transaction (e.g., a single motor vehicle accident), as here, the defendant still is assessed an additional increment of sentencing culpability for the multiple victims. *Id.* § 3D1.4.[6]

Using her highest total offense level of 22 as the foundation for imposing this additional increment as the Guidelines dictate, the PSR elevated Ms. Lente's offense level by four, resulting in a combined offense level of 26. The PSR computed a three-level reduction for acceptance of responsibility, resulting in a total offense level of 23. As discussed further below, although Ms. Lente had several tribal convictions, none yielded criminal history points under the Guidelines. Accordingly, the PSR placed Ms. Lente in a criminal history Category I. With her total offense level of 23, Ms. Lente's Guidelines range was thus 46 to 57 months.

The PSR found no grounds for a departure. Specifically, it stated: "After assessing the defendant's criminal history and social history, she does not appear

---

[6] Indeed, the involuntary manslaughter Guidelines expressly provide that when the multiple deaths do not result in separate counts of conviction the result will still be the same. U.S.S.G. § 2A1.4(b) ("If the offense involved the involuntary manslaughter of more than one person, Chapter Three, Part D (Multiple Counts) shall be applied as if the involuntary manslaughter of each person had been contained in a separate count of conviction."); *see id.* app. C, amend. 663, Reason for the Amendment ("The purpose of the instruction [in the involuntary manslaughter Guideline] is to ensure an incremental increase in punishment for single count offenses involving multiple victims."). For a helpful discussion of the operation of some of the Guidelines grouping rules in involuntary manslaughter cases, see *United States v. Wolfe*, 435 F.3d 1289, 1302 & n.9 (10th Cir. 2006).

to have any circumstances that would take her away from the heartland of cases of similarly situated defendants." PSR, *supra*, ¶ 101 at 33. The PSR did, however, recommend an upward variance. A Guidelines sentence, it stated, would not reflect the seriousness of Ms. Lente's crimes, provide just punishment, promote respect for the law, or deter Ms. Lente from committing further criminal acts.

In a pre-sentencing motion for an upward departure or an upward variance, the government stated, "the United States concurs with all [of the PSR's] recommendations and would urge the Court to adopt these as grounds for departure and or a variance from the Guidelines." R., Vol. I, Doc. 34, at 9 (United States Mot. for Upward Departure Pursuant to U.S.S.G. § 5K2.0 and a Variance from the Guidelines Pursuant to the Factors Enumerated in 18 U.S.C. 3553, dated Dec. 6, 2006). Because the PSR recommended a variance that partly was based on Ms. Lente's failure to initially accept responsibility, Ms. Lente claimed that, in supporting all of the PSR's recommendations, the government violated the plea agreement, since the government had stipulated in the plea agreement that Ms. Lente had accepted responsibility.

At sentencing, the district court considered the factors enumerated in 18 U.S.C. § 3553(a) and decided to impose an upward variance. In the process of enumerating the § 3553(a) factors, the district court stated:

The defendant admitted to consuming large amounts of alcohol prior to causing a head-on collision that left three people dead and one person seriously injured. A blood sample drawn from the defendant two hours after the accident revealed her blood alcohol level to be .21 percent. The defendant also has five tribal court convictions and three additional arrests, most of which involved the excessive use of alcohol and violence.

Furthermore, the defendant has never been licensed to drive a vehicle in this state; therefore, intoxicated or not, she should not have been operating a motor vehicle.

The Edwina and Charles Salazar and Bruce Murillo families were severely impacted by this crime. Not only did they lose their 12-year-old son, but their 18-year-old daughter was severely injured.

The defendant knowingly risked the lives of all other citizens on the roadways. It is also noted the defendant did not accept full responsibility for her actions. She attempted to shift some of the blame to her passenger by reporting he tried to grab the steering wheel while they were traveling. The accident reconstruction report stated there was no evidence to suggest that this happened.

Pursuant to 18 United States Code Section 3553(a)(2), the Court finds that a guideline sentence of 46 to 57 months would not reflect the seriousness of the offense, it would not promote respect for the law, and it would not provide a just punishment for this offense.

In this district, defendants having committed similar crimes, like the illegal reentry of an aggravated felon or drug offenses, frequently receive sentences in similar ranges. In this case, the defendant is directly responsible for killing three people and injuring another.

Furthermore, the Court finds the guideline sentence inadequate to deter Camille Lente from committing further

-7-

crimes. This Court notes the defendant has been on probation five times and still continues to abuse alcohol and break the laws of this country.

The Court also notes defendant is in need of vocational and educational training programs afforded by the Bureau of Prisons, given she has virtually no marketable job skills.

Given the factors noted, and when taken in combination, the Court concludes that the guideline imprisonment range in this case is not sufficient to satisfy the purposes of sentencing and does not provide a reasonable sentence in this matter.

R., Vol. III, Tr. at 42-44 (Sentencing Hearing, dated Dec. 14, 2006). The district court then imposed consecutive 72-month sentences for the three counts of involuntary manslaughter, which was the maximum sentence Ms. Lente could receive for these counts.[7] The court also imposed a concurrent term of 120 months for the assault count. The final sentence imposed was 216 months' imprisonment.

On appeal, Ms. Lente raises three issues. First, she argues that the length of her sentence is substantively unreasonable. Second, because her plea agreement required the government to support a three-level reduction for acceptance of responsibility, she contends that the government breached its plea agreement when it recommended an upward variance partly based upon her

---

[7]    At the time of sentencing in 2006, the maximum sentence for involuntary manslaughter was six years. The maximum sentence was changed to eight years in 2008. Court Security Improvement Act of 2007, Pub. L. No. 110-177, § 207, 121 Stat. 2534, 2538 (2008) (codified at 18 U.S.C. § 1112(b)).

failure to initially accept responsibility. Third, she argues that the district court erroneously enhanced her sentence based upon facts that were not proven beyond a reasonable doubt. I conclude that Ms. Lente's sentence is substantively unreasonable and should be vacated.

## II. DISCUSSION

When fashioning a sentence, the district court must take into account the factors enumerated in 18 U.S.C. § 3553(a). These factors include:

> the nature of the offense and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the crime, to provide adequate deterrence, to protect the public, and to provide the defendant with needed training or treatment.

*United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006). Overarching and guiding this determination is the "parsimony principle," which requires the district court to craft a sentence that is "'sufficient, but not greater than necessary, to comply with the purposes' of criminal punishment, as expressed in § 3553(a)(2)." *United States v. Martinez-Barragan*, 545 F.3d 894, 904-05 (10th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). In determining whether a variance is appropriate under the § 3553(a) factors, district courts appropriately may consider whether the particular circumstances of the defendant's offense remove the defendant from the heartland of defendants who have committed the same or

similar offenses.  *Id.* at 900 ("[H]eartland analysis is *also* a legitimate part of the district court's analysis of whether to vary from the Guidelines.").

On appeal, "[w]e review a federal criminal sentence for reasonableness, giving deference to the district court under 'the familiar abuse-of-discretion standard.'"  *United States v. Gambino-Zavala*, 539 F.3d 1221, 1227 (10th Cir. 2008) (quoting *Gall v. United States*, 128 S. Ct. 586, 594 (2007)).  Our appellate review "includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence."  *United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008).  Under substantive reasonableness review, we may not employ "'a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.'"  *Id.* at 807 (quoting *Gall*, 128 S. Ct. at 595).  Nor may we "examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo."  *Id.* at 808.  In other words, we will not vacate a sentence merely because we "disagree[] with the District Judge's conclusion that consideration of the § 3553(a) factors justified . . . a marked deviation from the Guidelines range."  *Gall*, 128 S. Ct. at 602.

Instead, we must "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance."  *Id.* at 597.

Substantive reasonableness review "contemplates a range, not a point," *United States v. Omole*, 523 F.3d 691, 698 (7th Cir. 2008) (internal quotation marks omitted), and "we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 1917 (2008); *see also United States v. Begay*, 470 F.3d 964, 975 (10th Cir. 2006) ("In any given case there could be a range of reasonable sentences that includes sentences both within and outside the Guidelines range."), *rev'd on other grounds,* 128 S. Ct. 1581 (2008). A non-Guidelines sentence falls outside this range of reasonableness only when the court's justification is not "sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597; *see also United States v. Pinson*, 542 F.3d 822, 837 (10th Cir.) (noting that a sentence is substantively reasonable only when the "district court's proffered rationale, on aggregate, justifies the magnitude of the sentence"), *cert. denied*, 129 S. Ct. 657 (2008), *cert. denied*, 129 S. Ct. 1369 (2009); *United States v. Cavera*, 550 F.3d 180, 198 (2d Cir. 2008) (en banc) (Katzmann, J., concurring) ("Courts will have to determine in individual cases the line at which reasonableness ends and arbitrariness begins, with the twin hobgoblins of widely variant sentences and overbearing circuit-court review lurking in the shadows."), *petition for cert. filed*, 77 U.S.L.W. 3516 (U.S. Feb. 23, 2009) (No. 08-1081).

However, "appellate review continues to have an important role to play and must not be regarded as a rubber stamp." *Pinson*, 542 F.3d at 836; *see United States v. Pugh*, 515 F.3d 1179, 1182-83, 1191 (11th Cir. 2008) (noting that *Gall*'s "directives leave no doubt that an appellate court may still overturn a substantively unreasonable sentence, albeit only after examining it through the prism of abuse of discretion, and that appellate review has not been extinguished"); *see also Cavera*, 550 F.3d at 191 ("[W]e will continue to patrol the boundaries of reasonableness, while heeding the Supreme Court's renewed message that responsibility for sentencing is placed largely in the precincts of the district courts."); *cf. United States v. Whitehead*, 559 F.3d 918, 918 (9th Cir. 2009) (Gould, J., dissenting) ("The problem is simply that the desirable principle of deference to the sentencing judge, if taken too far, is transformed into an undesirable principle of no review in effect for substantive reasonableness of a sentence, contrary to what the Supreme Court declared as law."); *id.* at 922 (Reinhardt, J., dissenting) ("The Supreme Court has ruled, and fairness demands, that we must conduct a serious review of the sentences imposed by district judges to ensure that they are reasonable. We abdicate our responsibility when we fail to do so—whoever the defendant may be, and whatever the crime.").

Even after *Gall*, this court and our sister circuits have found sentences to be substantively unreasonable. *See United States v. Friedman*, 554 F.3d 1301, 1308 (10th Cir. 2009) (concluding that a sentence of 57 months' imprisonment, down

-12-

from a Guidelines range of 151 to 188 months, was substantively unreasonable);

*Pugh*, 515 F.3d at 1182-83 (finding the district court's sentence of five years'

probation, which was varied downward from a Guidelines range of 97 to 120

months' imprisonment, to be substantively unreasonable); *Omole*, 523 F.3d at

697-700 (concluding that the district court's sentence of 12 months'

imprisonment, 51 months below the low end of the Guidelines range of 63 to 78

months, was substantively unreasonable); *United States v. Abu Ali*, 528 F.3d 210,

258-59, 269 (4th Cir. 2008) (finding the defendant's sentence of thirty years,

which was varied downward from the Guidelines recommendation of life

imprisonment, to be substantively unreasonable), *cert. denied*, 129 S. Ct. 1312

(2009); *cf. Whitehead*, 559 F.3d at 920 (Gould, J., dissenting) (noting that, by its

ruling in the instant case, the Ninth Circuit has put itself "in what I consider to be

a conflict with several of our sister circuits who have adopted a more vigorous

approach to reviewing sentences for reasonableness").

In this case, Ms. Lente was sentenced to 216 months' imprisonment, which

was 159 months above the high end of the Guidelines range or, stated differently,

was almost four times the high end of that range.[8]  Because it imposed a variance

_____

[8]      Viewed another way, for illustration purposes only, the sentence
amounted to a 279% increase from the high end of the Guidelines range.  *See
Omole,* 523 F.3d at 698 n.1 ("We include the percentage for purposes of
illustration, and refrain from using the mathematical variance in our
reasonableness determination.").  *See generally United States v. Valtierra-Rojas*,
(continued...)

that cannot be described as anything less than "major," the district court needed to provide "significant justification" for Ms. Lente's sentence. *See Gall*, 128 S. Ct. at 597 ("We find it uncontroversial that a major [variance] should be supported by a more significant justification than a minor one."); *see also Pinson*, 542 F.3d at 836-37 (noting that defendant's variance sentence, which was "135 months above what he would have received had he been sentenced within the applicable guidelines range," was "unusually large, even by post-*Gall* standards"); *Pugh*, 515 F.3d at 1200-01 (noting that "[i]n the Supreme Court's parlance," the district court's sentence that "amounted to a 97-month variance" was "undeniably 'major'" (quoting *Gall*, 128 S. Ct. at 597)); *Abu Ali*, 528 F.3d at 261 ("simply tak[ing] note" that a sentence amounting to a 40% downward variance was "major" (quoting *Gall*, 128 S. Ct. at 597)).

The court essentially gave seven reasons for the sentence: 1) Ms. Lente had a high BAL of 0.21 and, therefore, knowingly risked the lives of others on the road; 2) Ms. Lente drove without a license; 3) Ms. Lente had five Tribal Court convictions and three additional arrests—most of which involved the excessive use of alcohol and violence—and these convictions, along with her five separate probations, had failed to deter her from abusing alcohol and breaking the law; 4)

[8](...continued)
468 F.3d 1235, 1240 (10th Cir. 2006) (discussing, pre-*Gall*, our partial reliance in substantive reasonableness review on "the percentage of divergence" criterion).

-14-

Ms. Lente initially failed to accept responsibility for the accident; 5) Ms. Lente was in need of vocational and educational training; 6) Ms. Lente caused particularly severe damage to the Edwina and Charles Salazar and Bruce Murillo families; 7) at a policy level, offenders guilty of illegal reentry following conviction of an aggravated felony or a drug offense often receive sentences within Ms. Lente's Guidelines range, yet Ms. Lente killed three people and injured another.

As noted, Ms. Lente challenges the substantive—not procedural—reasonableness of her sentence. Accordingly, the propriety of the district court's reasons for imposing the upward variance are not at issue here. *See Smart*, 518 F.3d at 803-04 ("We agree that if a district court bases a sentence on a factor not within the categories set forth in § 3553(a), this would indeed be one form of procedural error. Section 3553(a) . . . implicitly forbids consideration of factors outside its scope."). Rather, "[a]t the substantive stage of reasonableness review," we must determine whether the court's reasons "can bear the weight assigned" to them. *Cavera*, 550 F.3d at 191.

After reviewing Ms. Lente's sentence, "giv[ing] due deference to the district court's decision that the § 3553(a) factors, on a whole, justif[ied] the extent of the variance," *Gall*, 128 S. Ct. at 597, I conclude that her sentence is substantively unreasonable. *See Friedman*, 554 F.3d at 1308 (concluding that "even given the highly deferential abuse-of-discretion standard of review," the

sentence imposed by the district court was substantively unreasonable). The district court created a "sparse record" in justifying the major-variance sentence that it gave to Ms. Lente and that must necessarily "bear[] on the question" of whether that sentence is substantively reasonable. *Id.* at 1308 n.10 ("We note the undeniably sparse record in this case certainly bears on the question whether Friedman's sentence is substantively reasonable."). In most instances, it is difficult to determine the precise weight the court accorded to the seven reasons that it articulated. While, as noted below, the district court's reasons might well justify *some* upward variance, I simply cannot conclude on this record that they justify the major variance that Ms. Lente received. *See Cavera*, 550 F.3d at 201 n.6 (Raggi, J., concurring) ("While this [substantive reasonableness] review is deferential, it nevertheless follows that a factor or justification that could support a 24-month sentence might *not* bear the weight of a 24-year sentence." (emphasis added)); *Omole*, 523 F.3d at 700 (holding a downward variance to be substantively unreasonable, but noting that "[w]e are not saying that *any* below-guidelines sentence for [defendant] would have been unreasonable" (emphasis added)). I see no indication that the court fashioned a parsimonious sentence—one that is sufficient, but not greater than necessary to effectuate the statutory objectives of sentencing expressed in § 3553(a). *Cf. United States v. Beiermann*, 599 F. Supp. 2d 1087, 1091 (N.D. Iowa 2009) (finding defendant's crimes to be "very serious," but varying downward because the sentence

prescribed by the child pornography Guidelines "would be at odds with the 'parsimony provision' of the federal sentencing statute"). I review the district court's reasons for Ms. Lente's sentence in turn.

First, the district court's finding that Ms. Lente knowingly risked the lives of others on the road certainly finds support in the evidence, given Ms. Lente's consumption of a large amount of alcohol on the day of the accident and her resulting BAL of 0.21. However, the record is completely devoid of evidence to indicate that Ms. Lente's case falls so far afield from the heartland of cases involving similar crimes to justify the district court's major variance—almost four times the high end of the Guidelines range.[9] *See Martinez-Barragan*, 545 F.3d at 900 ("[H]eartland analysis is *also* a legitimate part of the district court's analysis of whether to vary from the Guidelines.").

While obviously a BAL of 0.21 is significantly above the legal limit, the court made no finding that Ms. Lente's BAL was so extraordinarily high relative to most drunk driving cases involving fatalities to warrant its variance sentence.[10]

---

[9] Indeed, although recommending an upward variance, the PSR at the same time found that Ms. Lente's case did not "appear to have any circumstances that would take her away from the heartland of cases of similarly situated defendants." PSR, *supra*, ¶ 101 at 33.

[10] Information relating to such issues would seemingly have been readily available to the parties. *See, e.g.*, National Center for Statistics and Analysis, National Highway Traffic Safety Administration, 2007 Traffic Safety Annual Assessment—Alcohol-Impaired Driving Fatalities, Figure 3, at 5 (2008) (discussing the median BAL of drivers involved in fatal crashes).

Furthermore, and more significantly, I must acknowledge the regrettable fact that alcohol-related vehicular homicides—which typically give rise to federal involuntary manslaughter prosecutions—are an enduring and tragic circumstance in Indian Country. *See, e.g.*, Lawrence L. Piersol, et al., *Report of the Native American Advisory Group* 14 (2003) [hereinafter *Native American Advisory Group*] (noting that "the 'heartland' of Indian country cases involved alcohol-related vehicular homicides"); Pamela O. Barron, et al., *Manslaughter Working Group Report to the Commission* app. 4 at 7 (1997) [hereinafter *Manslaughter Working Group*] ("In Sentencing Commission data for the years 1994-1996, American Indians comprised 72% of all persons sentenced for vehicular manslaughter. Alcohol was present at the time of the instant offense in 93% of these cases."); *see also Native American Advisory Group* at iv ("Data on all offenses reviewed by the Advisory Group confirms the devastating role that alcohol plays in reservation crime."). Indeed, the Guidelines specifically recognize the recklessness typically associated with alcohol-related vehicular homicides (which occur with regrettable frequency in Indian Country) by providing an elevated base offense level of 22 for such conduct. U.S.S.G. § 2A1.4 (a)(2)(B) (imposing the highest base offense level where "the offense involved the reckless operation of a means of transportation"); *see id.* app. C, amend. 663, Reason for Amendment (noting that the new alternative offense level "addresse[d] concerns raised by some members of Congress and comport[ed] with

-18-

a recommendation from the Commission's Native American Advisory Group that vehicular manslaughter involving alcohol or drugs should be sentenced at offense level 22"). Ms. Lente's case exhibited this heartland characteristic and, accordingly, she received the elevated offense level of 22.[11]

I do not for one moment discount the seriousness of Ms. Lente's conduct. Finding some guidance (albeit limited) in our prior cases that have upheld Guidelines upward departures in circumstances involving motor vehicle accidents caused by intoxicated drivers,[12] I do not gainsay the idea that, in exercising its

---

[11] Furthermore, as outlined *supra* in text and note 4, in their grouping rules, the Guidelines also endeavor to formally recognize the added measure of culpability and harm arising from the multiple deaths that sadly are not uncommon in such alcohol-related vehicular homicide cases. *See* U.S.S.G. § 3D1.4; *id.* § 2A1.4(b); *see also Wolfe*, 435 F.3d at 1302 & n.9. And, the involuntary manslaughter Guidelines specifically ensure that where the multiple deaths do not result in separate counts of conviction the result will still be the same. *Id.* § 2A1.4(b). Ms. Lente's sentence was computed under these grouping rules.

[12] Lest I be misunderstood, I do *not* suggest that because we previously have upheld departures on similar facts that such an outcome is mandated here. Relevant to this point, we have noted: "[E]ven if the two defendants had identical histories and committed identical crimes, a decision by our Court to uphold a district court's departure in one case cannot possibly be read to entitle later defendants in similar cases to a downward variance as a matter of right, or to fetter the sentencing discretion Congress has vested in the district courts." *United States v. Angel-Guzman*, 506 F.3d 1007, 1019 (10th Cir. 2007). With regard to departures, I recognize that district courts—both before and after *Booker*—have been required to exercise their sentencing discretion within the structural constraints of the Guidelines, which favor and disfavor certain departure grounds. *See United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008) ("We have now held that district courts have broad discretion to consider individual characteristics like age, employment, and criminal history in fashioning an

(continued...)

-19-

discretion, the district court here could reasonably conclude on these facts that

*some* upward variance would be appropriate. *See, e.g.*, *United States v.*

---

[12](...continued)
appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the Guidelines or already accounted for in another part of the calculation."); *United States v. Sells*, 541 F.3d 1227, 1237-38 (10th Cir. 2008) ("In deciding whether to depart from an otherwise applicable Guideline range, a district court is specifically discouraged from considering a defendant's age. U.S.S.G. § 5H1.1. Nevertheless, in deciding whether to vary, pursuant to § 3553(a), from that range, district courts have broad discretion to consider individual characteristics like age." (footnote omitted)), *cert. denied*, 129 S. Ct. 1391 (2009); *see also United States v. Munoz-Tello*, 531 F.3d 1174, 1186 & n.22 (10th Cir. 2008) (noting that "[e]ven after *Booker*, we review upward departures using a four part test," asking *inter alia* whether the factual bases supporting the departure are permissible departure factors), *cert. denied*, 129 S. Ct. 1314 (2009). However, underlying the quoted observation from *Angel-Guzman* is a central point: As to both departures and variances, we operate under a roughly similar, but not conterminous, deferential abuse-of-discretion standard of review. *Compare Angel-Guzman*, 506 F.3d at 1019 (noting the abuse-of-discretion review applicable as to departures and noting that "we show similar deference to the district court in its decision not to grant a variance"), *with Munoz-Tello*, 531 F.3d at 1186 (noting the use of a unitary abuse-of-discretion of review in assessing the propriety of departures after *Booker*). *See also Cavera*, 550 F.3d at 188 n.5 ("The Supreme Court has suggested that the "unreasonableness" standard is a particularly deferential form of abuse-of-discretion review."). Under this standard, especially as to variances (which are not hindered, *inter alia*, by the Guidelines structural constraints related to favored and disfavored sentencing factors), district courts have considerable freedom to exercise their discretion, in imposing individualized sentences, to reach a variety of reasonable sentencing outcomes as to similarly situated defendants; therefore, the results reached by a sentencing court in one case would not mandate the same outcome in a different case, before that particular court or another, even though the cases involve the same or similar facts. Nevertheless, we logically can glean clues regarding the reasonableness question in this variance case from surveying the historical range of enhanced sentences that have been upheld (or vacated) by our court under a roughly comparable standard of review applicable in the downward departure context, at least where the same or similar sentencing factors are at issue (e.g., recklessness).

*Pettigrew*, 468 F.3d 626, 641 (10th Cir. 2006); *United States v. Whiteskunk*, 162 F.3d 1244, 1247-48, 1252-53 (10th Cir. 1998). That is, although the district court did not specifically articulate the weight it assigned in its upward variance analysis to this particular reason, I do not question that the court could attribute significant weight to it. However, I cannot conclude on this record that the district court has demonstrated that this recklessness factor is capable of bearing the weight with respect to Ms. Lente's major-variance sentence.

For example, in the upward departure context, district courts have granted sentencing increases of a considerably more modest nature—apparently not more than twice the Guidelines range—based upon conduct that, in certain instances, was at least arguably more reckless than Ms. Lente's. *See, e.g.*, *Pettigrew*, 468 F.3d at 641 (upholding upward departure of two offense levels for excessive recklessness, where defendant was "driving while intoxicated with a blood-alcohol level of approximately three times the legal limit and crossing the highway against traffic"); *United States v. Zunie*, 444 F.3d 1230, 1236 (10th Cir. 2006) (upholding upward departure of two offense levels for significantly endangering public safety, where "[t]he jury heard evidence that [the defendant] drove his one-ton truck while intoxicated and exceeded the speed limit by over 25 mph, that he drove so erratically that he forced five or six vehicles off the road, that he crossed the center line into the opposite lane of traffic, and that, despite [the victim's] attempts to evade collision, [the defendant] struck [the victim's]

-21-

vehicle head-on"); *cf. Wolfe*, 435 F.3d at 1299, 1303 (calling the district court's nine-level departure, which included three offense levels for excessive recklessness and three offense levels for creation of a serious danger to public welfare, "extraordinary," where defendant, after having consumed "six or seven beers" and while driving at a high rate of speed, removed her hands from the steering wheel); *United States v. Jones*, 332 F.3d 1294, 1297, 1305 (10th Cir. 2003) (noting that the district court's one-level upward departure for significant danger to public safety was "reasonable" and concluding that an upward departure of "at most" four levels for extreme recklessness was appropriate, where "[a]t the time of the accident, [defendant's] blood-alcohol level was .266, over twice the legal limit" and, while driving a truck, defendant "crossed the center line and collided head on with the victims' Dodge sedan"). *See generally* U.S.S.G. § 1A1.1 editorial note, ch. 1, pt. A, introductory cmt. n.4(h) ("A change of 6 levels roughly doubles the sentence irrespective of the level at which one starts."). Accordingly, I conclude that the first reason cannot bear the weight of the major-variance sentence that the district court imposed on Ms. Lente.

Second, as for the district court's consideration of Ms. Lente's operation of a motor vehicle without a license as an apparent factor in its upward variance decision, the court offers us little by way of explanation to allow us to discern what weight the court assigns to the factor, and whether it can reasonably "bear the weight," *Cavera*, 550 F.3d at 191. The court simply stated that Ms. Lente

legally "should not have been operating a motor vehicle." R., Vol. III, Tr. at 42. That laconic approach leads me, in assessing the substantive reasonableness of the sentence, to significantly discount the weight the court reasonably could have attributed to this factor. *See Friedman*, 554 F.3d at 1308 n.10.[13] Furthermore, I note that there was no evidence indicating that there were any aggravating circumstances associated with Ms. Lente's lack of a driver's license: for example, she did not lose her license due to alcohol-related misconduct. Accordingly, I conclude that this factor could not have reasonably contributed to any significant extent to the district court's decision to impose the major variance at issue here.

Third, Ms. Lente had five Tribal Court convictions and three additional arrests, most of which involved the excessive use of alcohol and violence in the nature of assaults and batteries. Although the district court does not specify the weight it attributed to this factor, I do not question that the court reasonably could

---

[13] Perhaps this factor could bear some appreciable weight in the court's upward variance decision. *See Manslaughter Working Group*, *supra*, at 14 (noting that the Commission would "consider adding specific offense characteristics for" several factors, including "driving without a license (in a jurisdiction where a license is required)"); *id.* at app. 4 at 7 (noting that the "proposed explanatory factors" that speak to why an American Indian is "more likely to be involved" in a "fatal motor vehicle accident" than a non-Indian include "the presence of unlicensed drivers"). Indeed, the district court may have viewed the evidence of Ms. Lente's operation of her vehicle without a license as providing additional evidence of her disregard for the law that needed to be punished through an upward variance. However, I would be straying into the realm of speculation to construe the district court's laconic handling of this factor as conveying a specific rationale.

conclude that Ms. Lente's previous convictions and probations had failed to deter her from abusing alcohol and breaking the law and that some significant weight should be given to this factor in its upward variance analysis. However, I note that all of her convictions were misdemeanors; of these, almost half were juvenile adjudications, and the majority were family disputes.[14] Furthermore, even though most of the offenses involved excessive alcohol consumption and violence, they were not similar in kind to the instant offense. Ms. Lente apparently was not engaged in drinking and driving in any of the offenses. In other words, the significantly greater risk of harm and the heightened degree of seriousness associated with mixing alcohol consumption *with* driving were not factors in Ms. Lente's prior offenses. Lastly, there is no indication that she was represented by counsel in any of the proceedings.

Thus, Ms. Lente's previous criminal history and subsequent failure to reform, while relevant, do not seem to indicate "a commitment to a criminal lifestyle," *United States v. Mateo*, 471 F.3d 1162, 1170 (10th Cir. 2006), especially one involving unlawful conduct of a comparable level of seriousness as that giving rise to her involuntary manslaughter conviction. *See, e.g.*, *Jones*, 332 F.3d at 1302 (five previous drunk driving convictions); *Pettigrew*, 468 F.3d at

---

[14]    Ms. Lente apparently had a particularly difficult childhood. She was reportedly physically and sexually abused numerous times as a child and was brought up in a household where her parents and siblings abused alcohol and drugs.

641 (previous alcohol abuse resulted in the death of another person). Therefore, this factor could not reasonably provide a substantial foundation for the district court's major-variance sentence.

Fourth, while hospitalized and before she was indicted, Ms. Lente initially failed to accept full responsibility, claiming that her passenger, Mr. Tewahaftewa, pushed the steering wheel into oncoming traffic. A failure to accept responsibility certainly could be deemed by the district court to be a relevant sentencing consideration. The court, however, did not specify the weight it attached to this factor in its upward variance analysis. However, I conclude with little difficulty that the court reasonably could have given an appreciable amount of weight to it. Nonetheless, I note that Ms. Lente ultimately did accept full responsibility for her actions. Indeed, the PSR specified that she should receive a three-level reduction to her base offense level for acceptance of responsibility and, significantly, the district court did not rebuff that recommendation and, in fact, adopted it.[15] *See* R., Vol. II, at 1 (Statement of Reasons, dated Dec. 28, 2006) ("The court adopts the presentence investigation report without change."). In other words, this was not an "eleventh hour attempt to accept responsibility

---

[15] Indeed, although the district court could reasonably elect not to excuse Ms. Lente's evasive conduct, the court seemed to accept the idea that Ms. Lente's conduct was at least partly attributable to her alcohol-impaired condition in the period shortly following the accident. *See* R., Vol. III, Tr. at 11 (district court noting that "[s]he [Ms. Lente] came up with that story [shifting blame to Mr. Tewahaftewa] because she was drunk").

-25-

[which would bring] into question whether [she] manifested a true remorse for [her] criminal conduct." *United States v. Ochoa-Fabian*, 935 F.2d 1139, 1143 (10th Cir. 1991). Thus, I conclude that the district court could not have reasonably assigned great weight in its major-variance determination to Ms. Lente's failure to accept full responsibility.

Fifth, I do not question that the district court could assign some weight in its variance decision to Ms. Lente's need for "vocational and educational training." *See United States v. Tsosie*, 376 F.3d 1210, 1215 (10th Cir. 2004).[16] However, it is unclear how much the district court relied on this factor, since there were no findings that a 216-month sentence—as opposed to, for example, a shorter sentence in the Guidelines range—was required to appropriately rehabilitate Ms. Lente. The "undeniably sparse record in this case" on the role of vocational or educational training in the district court's major-variance determination necessarily "bears on the question" of whether that determination is substantively reasonable. *Friedman*, 554 F.3d at 1308 n.10. And, consequently, I am led to significantly discount the weight the court reasonably could have

_____

[16] Although, as Ms. Lente argues, § 3582(a) does say that "imprisonment is not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), we have held that this only "clarif[ies] that it is inappropriate to impose a sentence to a term of imprisonment *solely* for rehabilitative purposes or correctional treatment." *Tsosie*, 376 F.3d at 1215 (emphasis omitted and emphasis added).

-26-

attributed to this factor as a justification for an upward variance, especially one of the magnitude at issue here.

Sixth, the district court could reasonably attribute weight in its variance decisions to the impact that Ms. Lente's actions had on the victims' families. In particular, at the sentencing hearing, family members of Andres and Jessica Murillo, Anthony Tewahaftewa, and Joshua Romero offered poignant testimony concerning the emotional pain and suffering inflicted upon them by Ms. Lente's conduct. Most of them implored the court to impose the harshest sentence permissible under the law on Ms. Lente. In seeking "to provide just punishment," 18 U.S.C. § 3553(a)(2)(A), it certainly was reasonable for the district court to recognize the egregious damage Ms. Lente's criminal conduct caused to the victims and their families. "Courts have always taken into consideration the harm done by the defendant in imposing sentence . . . ." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). However, there are obviously limits to which a family's grief can increase a sentence. Unfortunately, we have seen even worse impacts on a family as a result of drunk driving; yet, the sentencing enhancement imposed by the district court there was considerably shorter and not even roughly comparable to that received by Ms. Lente. *See, e.g.*, *Jones*, 332 F.3d at 1302 (noting that departing upward of *one offense level* was proper when "[t]he normal tragedy of multiple deaths was worsened by the complete elimination of one branch of [two] different families," such that the mother, father, and child were killed) (internal

-27-

quotation marks omitted)).  Indeed, getting to the heart of the matter, the major-variance sentence that the district court imposed on Ms. Lente was not within the range of enhancements that *ordinarily* would be "contemplat[ed]," *Omole*, 523 F.3d at 698, for such a factual circumstance.  Therefore, even assuming *arguendo* that the harm to the victims' families caused by Ms. Lente's conduct could play a large role in the district court's major-variance decision, I could not advance to sustain that decision unless I could gain some meaningful insight into the district court's perception of the unique dimensions of that factor here.  And I cannot gain that insight on this "sparse record."  *Friedman*, 554 F.3d at 1308 n.10. Accordingly, in carrying out our mandated function of "patrol[ling] the boundaries of reasonableness," *Cavera*, 550 F.3d at 191, I cannot conclude on this record that victim harm can justify (i.e., bear the weight of) the district court's variance determination.

Seventh, the district court apparently disagreed at a policy level with the Guidelines.  The court found: "In this district, defendants having committed similar crimes, like the illegal reentry of an aggravated felon or drug offenses, frequently receive sentences in similar ranges.  In this case, the defendant is directly responsible for killing three people and injuring another."  R., Vol. III, Tr. at 42-44.  I conclude that, although the district court could disagree with the policy judgment of the Guidelines, the court's rationale cannot bear the weight of the major-variance sentence it gave to Ms. Lente.

-28-

In *Kimbrough v. United States*, the Supreme Court held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." 128 S. Ct. 558, 575 (2007). The Court clarified the meaning of *Kimbrough* in *Spears v. United States*, 129 S. Ct. 840 (2009). In *Spears*, the Eighth Circuit had concluded that a district court "may not categorically reject the [crack-to-powder] ratio set forth by the Guidelines," but instead must make an "individualized, case-specific" determination. *Id.* at 842-43. The *Spears* Court disagreed. *Kimbrough*, the Court held, recognized "district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Id.* at 843. The latter, the Court held, had already been established pre-*Kimbrough*. *Id.* (citing *United States v. Booker*, 543 U.S. 220, 245-46 (2005)). Instead, *Kimbrough* held that "district courts are entitled to reject and vary *categorically* from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."[17] *Id.* at 843-44 (emphasis added). A contrary conclusion,

_____

[17] Put most simply, as I understand it, this means that the district court may elect, for example, to increase the Guidelines offense level to be applied to the defendant because, *as a general matter*, the court disagrees with the policy judgment reflected in a particular Guidelines provision, which assigns the defendant to a lower offense level, even before the court begins to assess how the

(continued...)

the *Spears* Court believed, would cause district courts either to treat the crack-to-powder ratio as mandatory or to "continue to vary, masking their categorical policy disagreements as 'individualized determinations'"—an outcome the Court labeled "institutionalized subterfuge." *Id.* at 844.

Although *Kimbrough* arose in the crack-powder cocaine context, we have not questioned that its holding concerning policy disagreements extends beyond that context. *See Friedman*, 554 F.3d at 1311 (not questioning the reach of *Kimbrough* outside of the crack-powder cocaine context, where defendant asserted a policy disagreement with the career offender Guidelines in a bank robbery case, but noting that "this court need not delve into a difficult antecedent question: how this court should review district court sentences based simply on a

_____

[17](...continued)
defendant's particular circumstances should affect his sentence. *See Cavera*, 550 F.3d at 191 ("As the Supreme Court strongly suggested in *Kimbrough*, a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *Beiermann*, 599 F. Supp. 2d at 1104-05 (rejecting "entirely" on "categorical, policy grounds" the child pornography Guidelines *before* examining particular circumstances of defendant and his offenses). After increasing the offense level, the court may find that there is nothing about the defendant's particular circumstances or the circumstances of her offense that would otherwise suggest that the sentence prescribed by the Guidelines does not squarely fit (that is, it may find that the defendant is a mine-run defendant). Alternatively, after examining the particulars related to defendant and her offense, the court might well find under the statutory sentencing factors of 18 U.S.C. § 3553(a) that a further deviation from the advisory Guidelines sentencing range is appropriate, in the form of an additional variance.

policy disagreement with the Guidelines").  And I see no principled basis for such a restriction.

Among those that have taken a definitive position, our sister circuits appear to be uniformly in accord with this view.  *See Cavera*, 550 F.3d at 196-97 (upholding a district court's variance based on its finding that the Guidelines failed to take into account "the greater need for deterrence in New York" for firearms offenses because its strict firearms laws had produced a comparatively "more profitable black market in firearms"); *United States v. Tankersley*, 537 F.3d 1100, 1113 (9th Cir. 2008) (concluding that the district court's "decision to depart—based on its desire to punish terrorist activities directed at private conduct in a manner similar to how it punished terrorist activities direct [sic] at government conduct—did not render [the defendant's] sentence per se unreasonable"), *petition for cert. filed*, 77 U.S.L.W. 3517 (U.S. Mar. 2, 2009) (No. 08-1104); *United States v. Herrera-Garduno*, 519 F.3d 526, 530 (5th Cir. 2008) (in discussing the defendant's argument that the district court imposed a non-Guidelines sentence primarily because it disagreed with how "drug trafficking offenses" are defined under § 2L1.2, noting that *Kimbrough* recognized that "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines" (internal quotation marks omitted) (quoting *Kimbrough*, 128 S. Ct. at 570)); *accord Beiermann*, 599 F. Supp. 2d at 1096 (in disagreeing on categorical policy grounds with U.S.S.G. §

2G2.2, the child pornography Guideline provision, finding that the "powerful

implication of *Spears* is that, in other 'mine-run' situations, the sentencing court

may also reject guidelines provisions on categorical, policy grounds"). *But cf.*

*United States v. Johnson*, 553 F.3d 990, 996 (2009) (suggesting that whether

*Kimbrough* and *Spears* extend beyond the crack-powder cocaine arena is an open

question).

The district court's policy disagreement in Ms. Lente's case, although less

than pellucid, appears to reflect a belief that the Guidelines categorically under-

punish involuntary manslaughter offenses. In the district court's opinion, the

Guidelines improperly equate the seriousness of involuntary manslaughter, a

crime that can result in multiple deaths and injuries, with aggravated-felony

illegal reentry offenses and drug crimes. The district court, however, also

referred to Ms. Lente and the specific circumstances of her offense (e.g., the

number of deaths resulting from the accident),[18] allowing for the arguable

contention that the district court's analysis involved "an individualized

determination" that the involuntary manslaughter Guidelines in the "particular

case" of Ms. Lente simply yielded an excessively low sentence. *See Spears*, 129

S. Ct. at 843. However, we need not decide whether the district court fashioned

---

[18] However, as noted *supra*, the Guidelines and its grouping rules, as a general matter, contemplate the possibility that a single event like a motor vehicle accident will result in multiple deaths, leading to an involuntary manslaughter prosecution.

an individualized, case-specific sentence, or whether it adopted a categorical policy disagreement with the Guidelines; either way, in light of *Spears*, the district court's policy disagreement was legally authorized. That does not end the matter, however. We must determine whether that policy disagreement can bear the weight of the major-variance sentence that the district court imposed on Ms. Lente.

When we "examine a district court's justification for differing from the Guidelines recommendation, our review must be informed by the 'discrete institutional strengths' of the Sentencing Commission and the district courts." *Cavera*, 550 F.3d at 191-92 (quoting *Kimbrough*, 128 S. Ct. at 574). "*Kimbrough* distinguishes between cases where a district court disagrees with Guidelines that were formulated based on special expertise, study, and national experience and those that were not and therefore 'do not exemplify the Commission's exercise of its characteristic institutional role.'" *Id.* at 192 n.9 (quoting *Kimbrough*, 128 S. Ct. at 575). *Kimbrough*'s analysis indicates that ordinarily district court's will be afforded greater leeway to engage in policy disagreements with the latter set of Guidelines, which are not the product of the Commission acting in its traditional institutional role. *See Friedman*, 554 F.3d at 1311 n.13 (discussing *Kimbrough*'s reasoning and noting that the Court "concluded that it did not need to definitively resolve that question" of whether a more rigorous, closer review should be applied to certain policy disagreements by sentencing courts with the Guidelines

because the crack-powder cocaine Guidelines did not involve the Commission acting in its traditional institutional role); *Cavera*, 550 F.3d at 192 ("[I]n *Kimbrough* itself, the Supreme Court found that no 'closer review' was warranted where a district court based its sentence on a policy disagreement with the 100-to-1 crack cocaine vs. powder cocaine weight ratio, because the crack cocaine Guidelines are not based on empirical data and national experience . . . ."); *Beiermann*, 599 F. Supp. 2d at 1100 ("Even before *Spears*, numerous district courts had read *Kimbrough* to permit a sentencing court to give little deference to the guideline for child pornography cases on the ground that the guideline did not exemplify the Sentencing Commission's exercise of its characteristic institutional role and empirical analysis, but was the result of congressional mandates, often passed by Congress with little debate or analysis.").

The Guidelines applied to Ms. Lente were carefully fashioned by the Commission while engaged in its traditional work. In other words, the Commission "'base[d] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough*, 128 S. Ct. at 574 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring), *vacated for reconsideration*, 128 S. Ct. 1869 (2008)). In particular, Ms. Lente was sentenced under the 2005 version of U.S.S.G. § 2A1.4. That version is the product of careful Commission study and numerous resulting amendments. Several of those amendments were

-34-

aimed at addressing concerns that the involuntary manslaughter Guidelines did not appropriately reflect the seriousness of the offense. More specifically, they were designed to increase the penalty for involuntary manslaughter cases involving vehicular homicides. In 2003, the Commission amended U.S.S.G. § 2A1.4 to increase the base offense level for reckless involuntary manslaughter offenses from a level 14 to a level 18, which corresponded to an approximate 50 percent increase in sentence length for these offenses, in order to "respond to a concern that the federal sentencing guidelines [did] not adequately reflect the seriousness of involuntary manslaughter offenses." U.S.S.G. app. C, amend. 652, Reason for Amendment.

These changes were made after extensive study:

> Specifically, the Department of Justice, some members of Congress, and an ad hoc advisory group formed by the Commission to address Native American sentencing guideline issues expressed concern that most federal involuntary manslaughter cases involve vehicular homicides, which analysis of Commission data confirmed. These commentators also indicated that these offenses appear to be underpunished, particularly when compared to comparable cases arising under state law. This disparity with state punishments has been confirmed by studies undertaken by the Commission. In addition, Congress increased the maximum statutory penalty for involuntary manslaughter from three to six years' imprisonment in 1994.

*Id.* Similarly, in 2004, the Commission amended U.S.S.G. § 2A1.4 to add a third alternative base offense level of level 22 for involuntary manslaughter offenses

that involved the reckless operation of a means of transportation.  U.S.S.G. app. C, amend. 663, Reason for Amendment.  The new alternative offense level "addresse[d] concerns raised by some members of Congress and comport[ed] with a recommendation from the Commission's Native American Advisory Group that vehicular manslaughter involving alcohol or drugs should be sentenced at offense level 22."  *Id.*  Thus, the involuntary manslaughter Guidelines under which Ms. Lente was sentenced clearly reflect the Sentencing Commission's exercise of its characteristic institutional role.

Generally, we will review policy disagreements with the Guidelines with the recognition that when the Commission has acted in its traditional institutional role, district courts should act with caution when electing to deviate from the Guidelines based upon policy disagreements with them.  *See United States v. Higdon*, 531 F.3d 561, 562 (7th Cir. 2008) ("As a matter of prudence . . . in recognition of the Commission's knowledge, experience, and staff resources, an individual judge should think long and hard before substituting his personal penal philosophy for that of the Commission.").  In some instances, as *Kimbrough* and *Spears* suggest, those decisions of sentencing courts to deviate from the Guidelines based upon policy disagreements will be subject to a heightened level of review.  *See Kimbrough*, 128 S. Ct. at 574 ("[W]hile the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range

-36-

'fails properly to reflect § 3553(a) considerations' even in a mine-run case."

(quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)); *Spears,* 129 S. Ct.

at 843 ("The implication [of *Kimbrough*] was that an 'inside the heartland'

[variance] (which is necessarily based on a policy disagreement with the

Guidelines and necessarily disagrees on a 'categorical basis') may be entitled to

less respect.").[19]

However, at the very least, district court decisions to vary based upon

policy disagreements must pass muster under general principles of reasonableness

review.  Under those principles, we are obliged to examine the nexus between the

district court's policy disagreement with the Guidelines and the magnitude of the

variance, to determine if the reasons for the policy disagreement can bear the

weight of the variance.  At this foundational level of review, I conclude that the

district court's decision here to deviate from the Guidelines cannot survive

scrutiny because the court completely failed to establish the requisite nexus

between its policy disagreement and Ms. Lente's sentence.  *Cf. Beiermann*, 599 F.

---

[19]    The Court has yet to provide "elaborative discussion of this matter"
because *Kimbrough* and *Spears* arose in the crack-powder cocaine context, and
the crack-cocaine Guidelines do not "exemplify the Commission's exercise of its
characteristic institutional role."  *Kimbrough*, 128 S. Ct. at 575; *see Cavera*, 550
F.3d at 192 ("We do not, however, take the Supreme Court's comments
concerning the scope and nature of 'closer review' to be the last word on these
questions. More will have to be fleshed out as issues present themselves."); *see
also Friedman*, 554 F.3d at 1311 n.13 (noting, but declining to resolve, "a
difficult antecedent question: how this court should review district court
sentences based simply on a policy disagreement with the Guidelines").

Supp. 2d at 1104-06 (on the other end of the spectrum, sentencing court providing an extensive explanation of the bases for its policy disagreement with the child pornography Guidelines).  Consequently, I have no need in this case to reach any definitive conclusions regarding the scope or operation of any heightened level of review.[20]

---

[20]    *Kimbrough* notes that "closer review" may be required if the sentencing court elects to vary "based *solely* on the judge's view that the Guidelines range 'fails properly to reflect § 3553(a) considerations' *even in a mine-run case*." *Kimbrough*, 128 S. Ct. at 575 (emphasis added) (quoting *Rita*, 127 S. Ct. at 2465).  Although I need not (and do not) resolve them, this language raises significant questions concerning whether some form of closer review would be applicable on these facts: the district court did not vary upward in sentencing Ms. Lente based *solely* on a policy disagreement with the Guidelines; and, as noted *supra* in text, I do not gainsay the idea that the district court reasonably could conclude, in exercising its discretion, that Ms. Lente's is not a mine-run case.  *Kimbrough*'s language (as quoted above) arguably could be interpreted, however, as doing nothing more than indicating that closer review may apply where the sentencing court varies based on a categorical policy disagreement with a set of Guidelines that reflect the Commission's traditional processes and handiwork, and providing us with the quintessential scenario giving rise to such a categorical policy disagreement—a mine-run case.  As *Spears* subsequently explained, "the point" of *Kimbrough* was to address the propriety of categorical policy disagreements.  *Spears*, 129 S. Ct. at 843.  And the "implication" of *Kimbrough*'s holding, said *Spears*, is that when a sentencing court varies in a mine-run (i.e., heartland) case based upon a policy disagreement, it "*necessarily* disagrees on a 'categorical basis.'"  *Id.* (emphasis added).  If *Kimbrough*'s language is read in this manner, then some form of closer review may be applicable with respect to a district court's justification for varying based upon a categorical policy disagreement with traditionally-crafted Guidelines, irrespective of whether the categorical policy disagreement is the sole reason for the court's variance, and regardless of whether the variance occurs in a mine-run case.  I have noted that arguably the district court varied upward here at least partly based upon a categorical policy disagreement with the Guidelines.  However, because the court's justification for its major upward variance based upon a policy

(continued...)

With regard to the district court's policy disagreement, its comments merely indicate its general dissatisfaction with the severity of the range of punishments prescribed by the involuntary manslaughter Guidelines because they are comparable to punishments provided for aggravated-felony illegal reentry offenses and drug crimes. The district court does not begin to explain how that general dissatisfaction provides the basis for the major-variance sentence that it imposed on Ms. Lente. *Cf. Tankersley*, 537 F.3d at 1107-09 (upholding the district court's policy decision to impose a twelve-level upward departure in order to achieve sentencing parity between defendants who engaged in similar conduct). Accordingly, I cannot conclude that the district court's policy disagreement with the Guidelines can support the major upward variance in this case.

Finally, even when I review the district court's reasons for Ms. Lente's sentence "on a whole," *Gall*, 128 S. Ct. at 597, I do not believe they can justify the major-variance sentence that Ms. Lente received. In this regard, my principal concern is not that the district court "did not specifically address each § 3553(a) factor in terms of why each factor justified the extent of the variance"; rather, the central point is that it is *not* "clear from reading the district court's . . .

---

[20](...continued)
disagreement with the Guidelines cannot withstand scrutiny under general principles of reasonableness review, I need not attempt to divine here the Supreme Court's intentions concerning the scope and operation of the (presumably) more rigorous "closer review" and, more specifically, I need not determine whether some form of that review would be appropriate on these facts.

explanation that it fully and adequately explained why it varied as it did." *United States v. Yanez-Rodriguez*, 555 F.3d 931, 948 (10th Cir. 2009); *cf. id.* at 949 ("In this case, the district court painstakingly went through each § 3553(a) factor, stating, where applicable, how the factor supported an upward variance.").

My analysis should not be construed in any way to minimize the seriousness of Ms. Lente's conduct. Because of her reckless acts, three people are dead. And Ms. Lente has inflicted untold, life-long suffering on the grieving families of her victims. However, at the same time, "an absolutely central feature of criminal justice [is that] for each offense there is an upper limit on the severity of just punishment." *See* Lawrence Crocker, *The Upper Limit of Just Punishment*, 41 Emory L.J. 1059, 1060 (1992). Part of reasonableness review is ensuring some rational relationship between the reasons for punishment and the ultimate sentence imposed. *See Cavera*, 550 F.3d at 201 n.6 (Raggi, J., concurring) ("While this [substantive reasonableness] review is deferential, it nevertheless follows that a factor or justification that could support a 24-month sentence might not bear the weight of a 24-year sentence.").

In sum, I recognize the lessons of *Gall* and *Kimbrough*: the district court has meaningful and broad sentencing discretion, and we may reverse only when the sentence imposed represents a clear abuse of discretion. However, the Supreme Court still instructs us to determine whether a district court's justification is "sufficiently compelling to support the degree of the variance."

*Gall*, 128 S. Ct. at 597. In this case, when I review Ms. Lente's sentence, "tak[ing] into account the totality of the circumstances, including the extent of [the] variance," *id.*, I can only conclude that the district court abused its discretion. The court did not sufficiently justify why Ms. Lente's 216 month sentence—159 months above the upper end of the Guidelines range—was a reasonable sentence, one that was "sufficient but not greater than necessary" to effectuate the statutory purposes of sentencing. Accordingly, I would hold that Ms. Lente's sentence is substantively unreasonable.